549 So.2d 294 (1989)
Prince A. WILLIAMS
v.
Jack KUSHNER, et al.
Nos. 88-C-1153, 88-C-1188.
Supreme Court of Louisiana.
September 12, 1989.
Concurring Opinion September 22, 1989.
Rehearing Denied October 19, 1989.
*295 Joseph Thomas, Angelique Reed, Ammon Miller, Jr., New Orleans, for Prince A. Williams.
Stephen Sullivan, New Orleans, Rene Pastorek, Gretna, for La. Patient's Compensation Fund and Sherman Bernard.
Sam LeBlanc, III, Robert Conrad, Jr., Richard Goins, Adams & Reese, New Orleans, for Louisiana State Medical Soc. and Louisiana Medical Mut. Ins. Co.
Carter G. Phillips, David Orentlicher, Sidley & Austin, Sam A. LeBlanc, III, Robert J. Conrad, Jr., Richard A. Goins, Adams & Reese, New Orleans, Kirk B. Johnson, Martin J. Hatlie, amicus curiae, for the American Medical Ass'n.
David W. Robertson, Baton Rouge, amicus curiae, for The Ass'n of Trial Lawyers of America and The Louisiana Trial Lawyers Ass'n.
S. Sanford Levy, New Orleans, amicus curiae, for S. Sanford Levy.
Robert L. Roland, Felix R. Weill, Katherine Long Gilmore, Baton Rouge, amicus curiae, for The Louisiana Hosp. Ass'n and Louisiana Hosp. Ass'n Ins. Trust.
Herbert J. Mang, Jr., Glen Scott Love, Mathews, Atkinson, Guglielmo, Marks & Day, Baton Rouge, amicus curiae, for the Louisiana Dental Ass'n.
Allan Berger, Berger & Forstall, James A. Wysocki, Stephanie Hrachovy, New Orleans, Attys. filing amicus curiae.
Concurring Opinion by Justice Calogero September 22, 1989.
PER CURIAM.
A writ was granted principally to consider the constitutionality of the $500,000 "cap" on recovery for a person injured by medical malpractice. On closer analysis following briefing and argument, it has become apparent that the recovery limitation is not presented in the context originally thought. A more careful study has revealed that there are three issues in these proceedings, one of which is moot.
The three issues are as follows:
(1) The constitutionality of the $400,000 limitation on recovery from the Patient's Compensation Fund.[1]
(2) The constitutionality of the $100,000 limitation on recovery against a qualified health care provider.[2]
(3) The constitutionality of denying the costs of future medical care and related benefits to a patient injured in a private facility and filing a claim prior to September 1, 1984.[3]
This opinion decides the first and third issues, but for reasons discussed below, the second issue is not before the court.
Suit was filed in January, 1983 by Prince A. Williams to recover damages for permanent injuries sustained by his son, Mark Williams, at his birth in a private hospital. The attending doctor, Dr. Jack Kushner, settled with plaintiff prior to trial for $100,000.[4] Plaintiff was given a jury trial[5] on quantum, and there was an unitemized verdict for $1,829,000.
After a Sibley hearing,[6] the trial court reduced the damages to the statutory limit of $400,000 and entered judgment for plaintiff against the Patient's Compensation Fund for $400,000 plus legal interest and costs. The court of appeal affirmed the judgment of the trial court.[7] Writs were *296 granted to review the decision.[8]
The record supports the jury's award of damages in excess of $500,000. Mark Williams has a useless right arm. He was diagnosed as having Erb's palsy and Klumke's palsy. It was stipulated that the injury occurred at birth and that the damage is permanent. Because of balance problems, Mark's physical activity is restricted: he has a poor self image and little self confidence. At every stage of his development, and particularly during adolescence, he will suffer from his handicap. He will never be able to engage in any activity requiring two hands or two arms. Discounted to present value, his future loss of earnings was estimated at $193,736. There was testimony that both Mark and his parents will need extensive psychological counseling to enable them to cope with his handicap.
The Louisiana statutory scheme places a $100,000 maximum on the health care provider's liability and provides a $400,000 supplemental amount available to each injured person, payable from the state operated Patient's Compensation Fund, thus limiting recovery to a total of $500,000. Plaintiff's suit attacks the total, claiming that the PCF should be cast for the entire amount (less $100,000) awarded by the jury.

I. Recovery Against the Patient's Compensation Fund.
For damages other than future medical care and related benefits, the $400,000 limitation on recovery from the Patient's Compensation Fund is a valid restriction. As the Supreme Court of Kansas observed:
"Because the Fund is a state-run insurance company, the State is free to limit its liability in any amount it wishes. The issue presented here is one of limiting the liability of a tortfeasor, namely the negligent health care provider." Kansas Malpractice Victims v. Bell, 243 Kan. 333, 757 P.2d 251, 256 (1988) (emphasis added).[9]
The legislature had the power to establish the fund and provide a supplemental recovery for those more seriously injured by medical malpractice. This affirmative act is not subject to the Sibley constitutional analysis. The fund is not a negligent party and does not have the status of an Article 2315 defendant.
Thus, there is no constitutional infirmity in the state's providing for payment of $400,000 in damages to plaintiff on behalf of his minor son, and plaintiff has no constitutional claim for a greater amount. See Prendergast v. Nelson, 199 Neb. 97, 256 N.W.2d 657 (1977).

II. Recovery Against the Health Care Provider.
In view of the conclusion reached on the first issue, it is apparent that the fundamental question involved is: what about the statutory limit of $100,000 damages payable by the doctor? This is indeed a vexing and difficult issue, as witness the disparate results reached in other states. To illustrate, Fein v. Permanente Medical Group, 38 Cal.3d 137, 211 Cal.Rptr. 368, 695 P.2d 665 (1985), upheld a $250,000 California limit on noneconomic damages; while Smith v. Department of Ins., 507 So.2d 1080 (Fla.1987) declared a Florida statute placing a $450,000 cap on noneconomic losses unconstitutional. For a more or less complete summary of treatment by the various states, see Appendix II.
Rephrased the issue here would be: Can the State of Louisiana limit a health care provider's liability to a maximum of $100,000 in a general scheme governing recovery for medical malpractice, which includes a limitation on total recovery of $500,000, without violating the equal protection and adequate remedy clauses of the Louisiana Constitution?
The answer must await another day; the issue is not before the court. Dr. Jack Kushner, the treating physician, was released from the suit prior to trial. Because of the settlement with Dr. Kushner, the *297 health care provider, his liability is a moot question.

III. Future Medical Care and Related Benefits.
While the third issue was not assigned as error in the precise language used here, the issue is implicit in the arguments urged by relator. Treatment of the question of medical benefits is appropriate at this time.
In 1984, Act 435 enacted LSA-R.S. 40:1299.43 to provide that the cost of "future medical care and related benefits" is excluded from the $500,000 limitation on recovery in private sector claims. In 1985, the same exception was made with regard to malpractice claims against the state.[10] However, the 1984 private sector act applies only to malpractice claims filed "on or after September 1, 1984," and would exclude the present claim. The 1985 act applies to "pending claims and litigation." Thus, if Mark Williams had been injured at birth in a state facility under the care of a state employee, his future medical expenses could be recovered. Because he was born in a private hospital under the care of a private physician, these expenses are legislatively placed in a different category. This anomaly is a clear violation of the Louisiana constitutional guarantee of equal protection.[11]
Despite wording to the contrary, Act 435 of 1984 must be reformed to apply to claims and litigation pending when it was passed. Plaintiff here is entitled to a judgment for the benefits provided.
For the foregoing reasons, the judgment of the court of appeal is amended to award plaintiff any future medical expenses and related benefits according to LSA-R.S. 40:1299.43.[12] The judgment of the court of appeal, which upheld a $400,000 award against the Patient's Compensation Fund, is affirmed as amended.
AMENDED AND AFFIRMED.
LEMMON, J., concurs and assigns additional reasons.
COLE, J., additionally concurs to join in the reasons assigned by LEMMON, J.
CALOGERO, J., additionally concurs and assigns reasons.
MARCUS, J., concurs in part and dissents in part and assigns reasons.
DIXON, C.J., and DENNIS, J., dissent with reasons.
APPENDIX I
LSA-R.S. 40:1299.43 provides:
A. (1) In all malpractice claims filed with the commissioner of insurance which proceed to trial, the jury shall be given a special interrogatory asking if the patient is in need of future medical care and related benefits and the amount thereof.
(2) In actions upon malpractice claims tried by the court, the court's finding shall include a recitation that the patient is or is not in need of future medical care and related benefits and the amount thereof.
(3) If the total amount is for the maximum amount recoverable, exclusive of the value of future medical care and related benefits, the cost of all future medical care and related benefits shall be paid in accordance with this Section.
(4) If the total amount is for the maximum amount recoverable, including the value of the future medical care and related benefits, the amount of future medical care and related benefits shall be deducted from the total amount and shall be paid from the patient's compensation fund as incurred and presented for payment. The remaining portion of the *298 judgment shall be paid in accordance with R.S. 40:1299.44(A)(7) and 40:1299.44(B)(1), (B)(2) and (B)(3).
(5) In all cases where judgment is rendered for a total amount less than the maximum amount recoverable, including any amount awarded on future medical care and related benefits, payment shall be in accordance with R.S. 40:1299.44(A)(7) and 40:1299.44(B)(1), (B)(2), and (B)(3).
(6) The provisions of this Subsection shall be applicable to all malpractice claims filed on or after September 1, 1984.
(B)(1) "Future medical care and related benefits" for the purpose of this Section means all reasonable medical, surgical, hospitalization, physical rehabilitation, and custodial services and includes drugs, prosthetic devices, and other similar materials reasonably necessary in the provision of such services.
(2) "Future medical care and benefits" as used in this Section shall not be construed to mean non-essential specialty item or devices of convenience.
C. Once a judgment is entered in favor of a patient who is found to be in need of future medical care and related benefits or a settlement is reached between a patient and the patient's compensation fund in which the provision of medical care and related benefits is agreed upon and continuing as long as medical or surgical attention is reasonably necessary, the patient may make a claim to the patient's compensation fund through the office of the attorney general for all future medical care and related benefits directly or indirectly made necessary by the health care provider's malpractice unless the patient refuses to allow them to be furnished.
D. Payments for medical care and related benefits shall be paid by the patient's compensation fund without regard to the five hundred thousand dollar limitation imposed in R.S. 40:1299.42.
E. (1) The district court from which final judgment issues shall have continuing jurisdiction in cases where medical care and related benefits are determined to be needed by the patient.
(2) The court shall award reasonable attorney fees to the claimant's attorney if the court finds that the patient's compensation fund unreasonably fails to pay for medical care within thirty days after submission of a claim for payment of such benefits.
(F). Nothing in this Section shall be construed to prevent a patient and a health care provider and/or the patient's compensation fund from entering into a court-approved settlement agreement whereby medical care and related benefits shall be provided for a limited period of time only or to a limited degree.
(G). The patient's compensation fund shall be entitled to have a physical examination of the patient by a physician of the patient's compensation fund's choice from time to time for the purpose of determining the patient's continued need of future medical care and related benefits, subject to the following requirements:
(1)(a) Notice in writing shall be delivered to or served upon the patient or the patient's counsel of record, specifying the time and place where it is intended to conduct the examination.
(b) Such notice must be given at least ten days prior to the time stated in the notice.
(c) Delivery of the notice may be by certified mail.
(2) Such examination shall be by a licensed medical physician or chiropractic physician licensed under the laws of this state or of the state, parish, or county wherein the patient resides.
(3)(a) The place at which such examination is to be conducted shall not involve an unreasonable amount of travel for the patient considering all circumstances.
(b) It shall not be necessary for a patient who resides outside this state to come into this state for such an examination unless so ordered by the court.

*299 (4) Within thirty days after the examination, the patient shall be compensated by the party requesting the examination for all necessary and reasonable expenses incidental to submitting to the examination including the reasonable costs of travel, meals, lodging, loss of pay, or other direct expenses.
(5)(a) Examinations may not be required more frequently than at six months intervals except that, upon application to the court having jurisdiction of the claim and after reasonable cause shown therefor, examination within a shorter interval may be ordered.
(b) In considering such application, the court should exercise care to prevent harassment to the patient.
(6)(a) The patient shall be entitled to have a physician or an attorney of his own choice or both present at such examination.
(b) The patient shall pay such physician or attorney himself.
(7) The patient shall be promptly furnished with a copy of the report of the examination made by the physician making the examination on behalf of the patient's compensation fund.
(H). If a patient fails or refuses to submit to examination in accordance with a notice and if the requirements of Subsection G of this Section have been satisfied, then the patient shall not be entitled to attorney fees in any action to enforce rights pursuant to Subsection E of this Section.
(I). (1) Any physician selected by the patient's compensation fund and paid by the patient's compensation fund who shall make or be present at an examination of the patient conducted in pursuance of this Section may be required to testify as to the conduct thereof and the findings made.
(2) Communications made by the patient upon such examination by such physician or physicians shall not be considered privileged.
(J). The patient's compensation fund shall pay all reasonable fees and costs of medical examinations and the costs and the fees of the medical expert witnesses in any proceeding in which the termination of medical care and related benefits is sought.
APPENDIX II

State Court Cases Considering the Constitutionality of Medical Malpractice Damage Limitations
I. Four states have upheld medical malpractice limitations on damages: Indiana; California; Nebraska and Virginia. California only limits noneconomic damages for medical malpractice and Virginia has a "cap" of $750,000.

Johnson v. St. Vincent Hospital, Inc., 273 Ind. 374, 404 N.E.2d 585 (1980) upheld the Indiana medical malpractice act. The Louisiana Act is modeled on the Indiana Act, which provides a $500,000 limit on total recovery and a $100,000 limit on the liability of a health care provider for one occurrence. A state fund gives coverage between $100,000 and $500,000. The patient's compensation fund is administered by the Indiana Insurance Commissioner. Although the Louisiana act was amended to remove the limitation on medical expenses, the Indiana act has not been changed.
Fein v. Permanente Medical Group, 38 Cal.3d 137, 211 Cal.Rptr. 368, 695 P.2d 665 (1985) upheld a California statute which limited recovery of noneconomic damages to $250,000, but did not limit recovery of economic losses. Footnote 17 of Fein points out that the American Bar Association's Commission on Medical Professional Liability has recommended that no dollar limit be imposed on recovery of economic losses. Fein also upheld a provision of the California statute which gives credit for any collateral recovery by a plaintiff against the total damages, thereby modifying the collateral source rule.
Prendergast v. Nelson, 199 Neb. 97, 256 N.W.2d 657 (1977), considered the constitutionality of the Nebraska act which places a $500,000 ceiling on recovery for medical malpractice. Prendergast concluded that a claimant was being assured of $500,000 for *300 the payment of any malpractice claim and thereby given a remedy not previously available.
Etheridge v. Medical Center Hospitals, 237 Va. 87, 376 S.E.2d 525 (1989), upheld the Virginia statute which limited the total amount recoverable by one party against a health care provider to $750,000. The current statute raises the limit to $1 million. Other questions arising under the Virginia statute were certified to the Virginia Supreme Court in Boyd v. Bulala, 877 F.2d 1191 (4th Cir.1989).
II. Six states have decided that a medical malpractice "cap" is unconstitutional: Idaho; Illinois; Kansas; New Hampshire; North Dakota and Texas.

Jones v. State Board of Medicine, 97 Idaho 859, 555 P.2d 399 (1976) involved the Idaho medical malpractice act which had physician and hospital limits of $150,000 per claim and $300,000 per occurrence. The case was remanded for factual findings on the equal protection issue under an intermediate standard of review, i.e., whether the legislative means substantially furthered a valid state purpose.[1] After remand, the act was declared unconstitutional.[2]Wright v. Central Du Page Hospital Association, 63 Ill.2d 313, 347 N.E.2d 736 (1976), decided that an act limiting medical malpractice recovery to $500,000 was an arbitrary, special law, which also violated the Illinois constitution by vesting judicial power in medical review panels and restricting the right to trial by jury.
In Kansas, the total recovery for medical malpractice was capped at $1,000,000 with noneconomic loss limited to $250,000. A state fund provided coverage for uninsurable risks and claims exceeding $200,000. The Kansas scheme allowed supplemental payments by the fund for future medical care and related benefits up to a limit of $3,000,000 per claim through court proceedings. In Kansas Malpractice Victims v. Bell, 243 Kan. 333, 757 P.2d 251 (1988) the court stated that the fund constituted a state insurance company and the state could limit its liability, the issue being the constitutionality of limiting the net liability of the tortfeasors, the negligent health care providers. The Kansas Supreme Court concluded that the malpractice legislation was unconstitutional in failing to provide medical malpractice victims a full remedy by due course of law as guaranteed by the Kansas constitution. In addition, the legislation violated the Kansas bill of rights' guarantee of trial by jury.
The Supreme Court of New Hampshire stated:
It is simply unfair and unreasonable to impose the burden of supporting the medical care industry solely upon those persons who are most severely injured and therefore most in need of compensation. Carson v. Maurer, 120 N.H. 925, 424 A.2d 825, 837 (1980).
New Hampshire had a $250,000 cap on noneconomic damages which was found to violate that state's guarantee of equal protection.
In Arneson v. Olson, 270 N.W.2d 125 (N.D.1978), the North Dakota Supreme Court held that a $300,000 limitation on recovery for medical malpractice was a violation of the equal protection provision of the North Dakota constitution and the Fourteenth Amendment to the United States Constitution. The North Dakota scheme provided $100,000 in insurance for health care providers and participation in a fund for excess coverage up to $300,000. The North Dakota court noted that no state court of last resort had upheld a limitation as low as $300,000.
In Lucas v. U.S., 757 S.W.2d 687 (Tex. 1988), answering a certified question,[3] the Texas Supreme Court decided that a $500,000 limit on medical malpractice damages *301 against a physician or health care provider violated the Texas constitution's guarantee of "open courts." The Texas limitation applied separately to each physician or health care provider and the limitation did not apply to past or future medical, hospital and custodial care.
III. At least two states have struck down limitations on all noneconomic damages: Florida and Washington.
In Smith v. Department of Ins., 507 So.2d 1080 (Fla.1987), the Florida Supreme Court invalidated a $450,000 ceiling on all noneconomic damages.

Sofie v. Fibreboard Corp., 112 Wash.2d 636, 771 P.2d 711 (1989) considered a statute limiting noneconomic damages according to a formula applied to jury verdicts. The formula was found to violate Washington's constitutional guarantee of trial by jury.
IV. Other state courts of last resort have: (1) upheld a three-year statute of limitation on suits for medical malpractice, Reynolds v. Porter, 760 P.2d 816 (Okla. 1988); (2) declared caps on dramshop liability unconstitutional, Richardson v. Carnegie Library Restaurant, Inc., 107 N.M. 688, 763 P.2d 1153 (1988), McGuire v. C & L Restaurant, Inc., 346 N.W.2d 605 (Minn. 1984); (3) declared a limitation on recovery against state entities unconstitutional, Condemarin v. University Hospital, 775 P.2d 348 (Utah 1989); (4) upheld a $250,000 limitation on damages for pain and suffering, Samsel v. Wheeler Transport Services, 244 Kan. 726, 771 P.2d 71 (1989); (5) upheld a $200,000 limit on recovery against charitable organizations, Doe v. American Red Cross Blood Services, 297 S.C. 430, 377 S.E.2d 323 (1989); and (6) upheld prohibition of noneconomic damages and restriction of punitive damages in wrongful discharge cases, Meech v. Hillhaven West, Inc., 776 P.2d 488 (Mont.1989).
LEMMON, Justice, concurring.
The principal issues in the case at this juncture are (1) the constitutionality of the $500,000 limitation on medical malpractice recovery and (2) the parties who can be held liable for a judgment in excess of $500,000 if the limitation is unconstitutional.[1] Because a court should not decide constitutional issues when it is not necessary to do so, the second issue is properly addressed at the outset.
The only party before this court is the Patients Compensation Fund (PCF), all other parties having been dismissed and released as a result of a pretrial compromise which contained no reservations except as to PCF. Therefore, if PCF cannot be held liable for a judgment in excess of $500,000 (including the $100,000 paid by the health care provider), there is no justiciable controversy between the two parties remaining in the lawsuit as to the $500,000 limitation. St. Charles Parish School Board v. GAF Corporation, 512 So.2d 1165 (La. 1987).[2]
*302 Just as the St. Charles Parish School Board case was dismissed as moot on information received from a party that was not before the court, the present case should be dismissed as moot on a point called to our attention by PCF (a party who remains in the litigation) if "there is no existing award and substantial dispute ... which involves the legal relations of the parties who have real adverse interest, and upon which the judgment of the court may effectively operate through a decree of conclusive character".[3]Id. at 1171.
The Medical Malpractice Act clearly limits recovery against the PCF to $400,000 (except for exemptions from the limitation). La.R.S. 40:1299.42(B)(2) limits recovery against each qualified health care provider to $100,000, while Subsection (1) limits total recovery to $500,000. The legislative intent to limit recovery against the PCF to $400,000 in the case of one liable health care provider, to $300,000 in the case of two, and so on, could not have been clearer. Of course, the Legislature, in providing in Subsection (3) that the PCF is liable for any amount above the total liability of all liable health care providers could have restated the limitation on total recovery so clearly expressed in Subsection (1), but the Legislature is entitled to presume that the judicial branch of government will interpret its legislation reasonably. When Section 1299.42(B)(2) is viewed as a whole, it is evident that the Legislature intended three separate but unseverable limitations on recovery as part of the overall scheme.[4]
Furthermore, there is no constitutional objection to the Legislature's placing a limit on recovery against the PCF, an entity which had no individual or vicarious liability for medical malpractice damages except that created by the Legislature and limited as part of the overall scheme.
PCF cannot be held liable for any judgment in excess of $500,000 (except possibly for medical and related expenses treated under another issue). Inasmuch as plaintiffs have received $100,000 in compromise prior to trial and will receive an additional $400,000 under the judgment of the court of appeal (which is definitive, La.C.C.P. art. 1842, on that issue), and plaintiffs cannot recover a judgment in excess of $500,000 from PCF (except possibly for medical and related expenses), any decision on the constitutionality of the limitation cannot affect *303 the legal relations of the remaining parties to this litigation.
Distasteful as it is to decline to decide this issue of paramount interest to the members of the legal and medical professions, we can no more do so in this litigation than we could if a person filed a declaratory judgment action attacking the constitutionality of the limitation because other parties may be affected by the issue. Even if we held the $500,000 limitation unconstitutional, we could not grant this plaintiff any relief.
CALOGERO, Justice, concurring.
I subscribe to the majority's per curiam opinion because the plaintiff in this case has fully settled his claim with the defendant physician, Dr. Jack Kushner, judgment having been signed dismissing the suit as to that defendant with prejudice. As a result, no relief is available to the plaintiff through this litigation unless he is entitled to receive more than $400,000 from the Patient's Compensation Fund. Justice Lemmon's concurring opinion adequately states why the Fund, without independent liability in tort, and as a creature of the Legislature, has liability limited to $400,000.
Plaintiff cannot have the medical malpractice statute declared unconstitutional in part and yet enforce the right to recover unlimited damages from the PCF which has been created under that statute, unless the Legislature intended for that to be the case. Even if this Court were to find unconstitutional the effective $400,000 cap on the PCF,[1] the Court could not strike such cap and allow the plaintiff to recover more than $400,000, unless the Legislature meant for the various provisions of the Medical Malpractice Act to be severable. The test for determining the severability of a statute's provisions is whether an unconstitutional provision in a statute is so interrelated and connected with the constitutional provisions that these provisions cannot be separated without destroying the intention manifested by the Legislature in passing the act. Cobb v. Louisiana Bd. of Insts., 237 La. 315, 327, 111 So.2d 126, 130 (1958).
In my view the Legislature could not reasonably have intended for the Medical Malpractice Act to be enforced with all its particulars, yet with the PCF exposed to damages without limit. It is implicit in the scheme enacted by the Legislature that the Fund's exposure must be limited to $400,000 per claim. See La.R.S. 40:1299.42(B)(1)-(3). At least two considerations quickly make that evident. First, La.R.S. 40:1299.44(A)(2) requires that the funding of the PCF be "based upon actuarial principles" (i.e., payments into the fund must support the anticipated claims).[2] Second, the statute casts the Fund with liability simply upon the payment by a qualified health care provider of the first $100,000 in damages. La.R.S. 40:1299.44(C). After such payment is made, "the court shall consider the liability of the health care provider as admitted and established." La. R.S. 40:1299.44(C)(5). Thereafter the Fund can contest only the amount of the claimant's damages and must pay the balance of the claim as determined by settlement or judgment. La.R.S. 40:1299.44(C). Thus, any and all claims which prompt a health care provider or his insurer to pay $100,000 are assured of favorable liability determination against the Fund, and such liability would be unlimited in amount absent the $400,000 cap.
Surely the Legislature could not have intended such an open ended conclusive exposure with actuarial support for only $400,000 per claim. Without the $400,000 *304 cap, the Legislature's scheme for funding the PCF would be unworkable.
MARCUS, Justice (concurring in part and dissenting in part).
I agree that there is no constitutional infirmity to $400,000 limitation on recovery from the Patients' Compensation Fund. I also agree that because of the settlement with the health care provider, his liability is a moot question. However, I disagree with the majority that Act 435 of 1984 (La.R.S. 40:1299.43) violates the constitutional guarantee of equal protection. Unfortunately, plaintiff's claims for future medical care and related benefits are not affected by the act. Accordingly, I concur in part and dissent in part.
DIXON, Chief Justice (dissenting).
I respectfully dissent.
Mark L. Williams was born February 11, 1982, at Touro Infirmary in New Orleans, with Dr. Jack Kushner attending. During the birth process, Mark's shoulder was subjected to unrelieved pressure against his mother's pelvic bones, separating the right shoulder from the head and neck. According to the birth records and later medical studies, this pressure resulted in both Erb's palsy and Klumpke's syndrome, injuries to the brachial plexus. In layman's terms, the group of nerves in Mark's neck that energize the muscles of the right arm and hand were forcefully torn from the spinal cord, rendering the limb useless. The damage cannot be repaired; Mark's condition is permanent.
This suit under Louisiana's Medical Malpractice Act, R.S. 40:1299, 41-1299.47, was filed in January 1983 by Mark's father, Prince A. Williams, after completion of the medical review panel process. Seeking damages "in such amount as may be just in the premises," the petition asserted that the $500,000 recovery limitation of R.S. 40:1299.42(B)(1) violated several provisions of the Louisiana Constitution. A $100,000 settlement from Dr. Kushner was accepted prior to trial, which according to R.S. 40:1299.44(C)(5) established liability of the Patient's Compensation Fund (PCF) for any additional damages. Pursuant to this court's decision reported at 449 So.2d 455 (La.1984), a jury trial as to quantum was held in October 1984, resulting in a $1,829,000 verdict.
Responding to a motion to reduce the judgment to comply with the statutory limitation on recovery, the plaintiff reasserted his claims of unconstitutionality. Since an equal protection challenge was raised, the trial court ordered a hearing to conform with the requirements of Sibley v. Board of Supervisors of LSU, All 477 So.2d 1094 (La.1985) (on rehearing). Intervention by the Louisiana State Medical Society and the Louisiana Medical Mutual Insurance Company, a doctor-owned medical malpractice insurer, was permitted. At the conclusion of this hearing, the trial court upheld the statutory limitation and entered judgment for the plaintiff against the PCF for $400,000 plus legal interest and costs of the jury trial. The plaintiff's claim for penalties and attorney fees under R.S. 22:657-22:658 was rejected.
The plaintiff appealed to the Fourth Circuit Court of Appeal, again asserting that R.S. 40:1299.42(B)(1) violated §§ 3 and 22 of Article I of the Louisiana Constitution and that R.S. 22:657-22:658 should apply to the PCF. The PCF also appealed, seeking further reduction of damages below the $500,000 total award. The court of appeal affirmed the judgment of the trial court in all respects. Williams v. Kushner, 524 So.2d 191 (La.App. 4th Cir.1988). This court granted writs to both parties to review the decisions below. 526 So.2d 785 (La.1988).
R.S. 40:1299.42(B)(1), limiting the amount recoverable for a patient's death or injury to $500,000 plus interest and costs, was enacted by Acts 1975, No. 817, as part of comprehensive legislation affecting claims against participating private sector health care providers for acts of medical malpractice. A similar scheme for state providers of medical services was enacted a year later by Act 660 of 1976; liability of these providers was also limited to $500,000 plus interest and costs, to be paid by the state.
*305 In 1984, Act 435 amended the private-sector provision of R.S. 40:1299.42(B)(1) to provide that the cost of "future medical care and related benefits" was excluded from the $500,000 limitation on recovery; an analogous amendment to the statute governing liability of state providers was made by Acts 1985, No. 239. Significantly, however, Act 435 of 1984 included a provision that it would only apply "to all malpractice claims filed on or after September 1, 1984," while the amending act for the state-provider statute was expressly made applicable to all pending claims and litigation. Thus, had Mark Williams been born in a state facility under the care of a state employee, his future medical expenses, at least, would be fully recoverable. Under R.S. 40:1299.42(B)(1) prior to amendment, however, we are called upon to decide the constitutionality of an absolute recovery limitation of $500,000 on all damages suffered by Mark and his family.

ARTICLE I, SECTION 3
Louisiana's constitutional guarantee of equal protection is contained in Article I, § 3:
"No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliation. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations. Slavery and involuntary servitude are prohibited, except in the latter case as punishment for crime."
As explained in Sibley, supra 477 So.2d at 1108-09, a statutory limitation on recovery, such as the one before us, constitutes discrimination based on physical condition: one whose impairment requires greater compensation is denied the full recovery permitted to those suffering a less severe injury. Such classification violates Article I, § 3 unless the statute's proponents here, the PCF and intervenorshave demonstrated, by a preponderance of the evidence, that since it substantially furthers an appropriate state purpose, the discrimination is not arbitrary, capricious, or unreasonable. The record in the present case, as discussed below, establishes that this burden has been met.
The testimony and documentary evidence presented here suggest several causes for the medical malpractice insurance "crisis" of the mid-1970s, a national phenomenon. Earlier decades had seen both increased access to medical care through various government programs as well as a liberalization of tort liability doctrines. At the same time, improved technology made more complex procedures possible, but also increased the risk of adverse results. By the end of the 1960s, both the number of medical malpractice claims and the amounts paid in such cases, by settlement or judgment, were increasing.
The number of claims and amounts paid are the primary elements in determining the premiums charged for various types of liability insurance. By examining prior years' claims data, the expected number of claims per insured (frequency) and the expected total dollars to be paid for these claims (severity) are predicted; multiplication of the two factors yields a "pure premium" representing the total dollars expected to be paid per insured. The adequacy of the rates so determined is thus directly related to the accuracy of these projections.
But while such prediction is difficult with any insured risk, several features of medical malpractice insurance present special problems in this regard. One such factor is the relatively small size of the insured group, which lessens the reliability of statistical estimates; the extreme variation within the group (surgical and nonsurgical physicians, hospitals, dentists, nurses, etc.) contributes further to this imprecision. Of greater importance, however, is the extended period of time elapsed in most medical malpractice cases between the occurrence of the insured's act(s) and the payment or closure of a resulting claim.
This long "tail" was identified as having a significant impact on calculating premiums for medical malpractice insurance for a number of reasons. Although it allows *306 an insurer to earn interest on the premium income for a longer period of time, which may be factored into a rate calculation, the existence of this "tail" introduces additional uncertainty of prediction; data from prior years may not yet reflect all claims that will arise from those periods, so an estimate must be used.[1] More importantly, the delay between occurrence, reporting, and closure tends to obscure developing trends, such as the increases in frequency and severity previously discussed.
Thus, the early 1970s saw continued increases in the number of medical malpractice claims and, as inflation took hold, in the amounts being paid under such policies. These trends, however, were not timely reflected in the premiums being charged. Perhaps because this coverage was regarded by the industry as just another line of property/casualty insurance, not separately reported, and perhaps for the reasons outlined above, the need for rate increases may not have been recognized immediately.
Even when the trends were identified, though, it appears that the medical malpractice insurers delayed attempts to obtain premiums adequate for the changing conditions. Although the 1971-74 federal wage-price freeze may have contributed to this delay, the evidence also suggests that investment gains in the stock market were, for a time, sufficient to offset the underwriting losses that were beginning to receive attention. Furthermore, competition between carriers for group contracts with state medical societies and hospital associations ("sponsored programs"), which allowed a more balanced distribution of risks, acted to restrain the medical malpractice insurers' pursuit of rate hikes in the early years of the decade. Where premium increases were in fact sought, the reluctance of state regulators to grant the full amounts requested served to perpetuate the disparity between the necessary and the actual rates.
At the same time that the inadequacy of medical malpractice insurance rates was deepening, stock market declines that began in 1973 caused massive losses in the valuation of the property/casualty insurance industry's investment assets. As with any corporation, measurement of an insurer's balance sheet figure of "capital surplus" is determined by subtracting liabilities, including claim reserves, from the value of all assets; this surplus is regarded by insurance regulators as the "cushion" available in the event that actual claim payments exceed the amounts reserved for those claims. But when the worth of a company's assets is reduced, there is a concomitant reduction in the figure assigned as capital surplus. And shrinkage of this "cushion" is viewed by regulators and industry analysts alike as a sign that fewer risks can be assumed.
Such was the case by 1974: the property/casualty insurers' reduction in surplus was seen to require a corresponding decrease in premium income, the indicator of a company's outstanding risks. Since medical malpractice insurance was becoming such a problem area, some insurers decided to cease offering this coverage and reduce their potential liabilities in that manner, while other companies chose instead to raise malpractice premiums but eliminate other lines. Still others made similar decisions regarding termination and/or rate increases based upon regional or market considerations. Whatever course was chosen by individual companies, the impact on the availability and cost of medical malpractice insurance nationwide was significant.
The evidence presented here thus indicates that the medical malpractice insurance "crisis" of 1974-75 was the manifestation of these converging trends and events. Many companies announced that such coverage was being discontinued altogether or would be offered only in certain geographic areas or to current policyholders; significant changes in the terms of coverage were also introduced. Across the nation, notices were sent to those for whom medical malpractice *307 insurance was still available that considerable premium increases would be required. These insurer actions, in turn, became the focus of significant public attention.
Medical providers in Louisiana, already concerned by the media reports, soon found that the "crisis" would not bypass this state. In late 1974, fifty-seven hospitals were notified that their malpractice insurer, Argonaut Insurance Company, was canceling all policies in the state effective April 1, 1975. Many of those affected by this termination were small facilities providing the only hospital and emergency services for a widespread rural population. In some cases, replacement coverage could not be found, and hospital closures seemed imminent. But even those providers unaffected by the Argonaut withdrawal, and those able to obtain new malpractice policies in the face of cancellation, were made to realize that the availability of professional liability coverage could no longer be taken for granted.
This realization was reinforced by the massive premium increases instituted by the remaining medical malpractice insurers; in some cases, it was found that the new rates approached the coverage amounts being provided. These increases, combined with news reports of significant jury awards in situations where provider liability seemed questionable, led some specialists to consider restricting their practices. Others began to feel that the avoidance of suits, rather than the needs of the patient, was playing too large a role in determining a course of treatment. For these medical providers, continued increases in malpractice insurance premiums were seen as a threat to their ability to furnish affordable, high quality health care without the fear of substantial personal liability; legislative relief was sought.
The record in this case thus confirms that the 1975 Louisiana legislature was presented with evidence that immediate action, rather than lengthy study, was required to assure continued medical services for the general public. And this evidence suggested to the legislators that attainment of their goal would be aided by controlling the predictability of the medical malpractice insurance risks; such control was seen as crucial if this coverage was to remain available at reasonable rates to Louisiana's health care providers.
The predictability of risks was addressed by several provisions of Act 817 of 1975, such that consideration here must be given to the comprehensive system intended by the legislature. First, by limiting the provider's liability to $100,000, R.S. 40:1299.42(B)(2), commercial insurance is necessary only for that amount, and the rate calculation need only include the chance of losses up to that figure. Not only would this provision free the provider from fear of an excess judgment; it was also expected to stabilize insurer operations in the state and thereby control both the availability and cost of medical malpractice insurance.
Although the provider's insurance requirement was thus restricted to $100,000, testimony in the legislature indicated that some proportion of malpractice recoveries would reasonably exceed that amount. It had also been shown, however, that higher insurance limits generally required the use of national claims data, rather than that of an individual state, in rate calculations, and tended to involve the more volatile international reinsurance market. In order to ensure a source of payment for damages in excess of $100,000 yet lessen the influence of such "outside" factors on the necessary premiums, the Patient's Compensation Fund was established, R.S. 40:1299.44, to be financed by a surcharge paid by participating medical providers. But without a limitation of some sort on recovery from this fund, it could not fulfill its purpose: either participants would have to contribute enough to cover the real, but unpredictable, risk of many massive judgments, or the PCF might be depleted by that occurrence, leaving these malpractice victims with no source of payment.
Thus, having reasonably determined that a recovery limitation was necessary, the 1975 legislature had to decide at what level such a cap would be set. While $500,000 was the figure used in the recently passed *308 Indiana Malpractice Act, from which Act 817 was derived, evidence was also presented that there had been few medical malpractice awards over $200,000 in the state, and none approaching $500,000. Although other amounts were proposed, legislators who had served in that session testified that the limitation selected was considered the amount which best balanced the needs of all Louisiana citizens: few would actually be affected by the cap, but affordable medical care would remain available to all.
Therefore, the record before this court establishes that the $500,000 limitation on recovery of R.S. 40:1299.42(B)(1) substantially furthers a legitimate state purpose. In order to prevent hospital closures, significant restriction of physician practices, and substantial rapid increases in health care costs, control of medical malpractice insurance premiums was determined to be necessary. The "cap" at issue, in conjunction with the related statutory provisions, exerts such control by limiting the range of risks to be insured, thus increasing the accuracy of predictions necessary to rate calculations. Although this statute distinguishes between malpractice victims based upon the extent of their injuries, such discrimination has been shown to be neither arbitrary, capricious, nor unreasonable, and therefore not in violation of Article I, § 3 of our Constitution.

ARTICLE I, SECTION 22
Plaintiff in this case has also asserted, however, that the $500,000 recovery limitation of R.S. 40:1299.42(B)(1) violates Article
1. § 22 of the Louisiana Constitution, which states:
"All courts shall be open, and every person shall have an adequate remedy by due process of law and justice, administered without denial, partiality, or unreasonable delay, for injury to him in his person, property, reputation, or other rights."
It is argued that since an "adequate" remedy must necessarily include all damages that are proved, legislative action, as here, to restrict the amount recovered is prohibited by this Section.
The concepts embodied in our present Article I, § 22 have been traced to the Magna Carta,[2] and similar language can now be found in the constitutions of thirty-six[3] of our sister states. The incorporation of such a section in the document prepared by the Louisiana Constitutional Convention of 1864, then, undoubtedly represented a borrowing from one such common law jurisdiction. Although a motion was made to delete this provision as "surplusage," that proposal was defeated,[4] and in September 1864 the voters of this state adopted a constitution which stated that:
"All courts shall be open; and every person, for any injury done him, in his lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice administered without denial or unreasonable delay." La. Const. of 1864, Title VII, Art. 110.
The 1864 Constitution, however, was not recognized by the United States Congress; another convention was called in 1867, after the close of the Civil War, to reestablish a basis for state government. While a guarantee of "a certain remedy" was initially proposed[5] in a modification of the prior Article 110, consideration by the Committee on the Bill of Rights resulted in a recommendation of language virtually identical to that of the earlier provision.[6] This *309 proposal was then referred to the nine-member Committee on Draft.
Significantly, two versions of the Section now at issue emerged from this committee, and there was but one substantive distinction between the two: while a minority of four recommended that "every person ... shall have remedy by due process of law,"[7] the majority proposed that an "adequate remedy" be guaranteed.[8] With no reported discussion or opposition, the latter was adopted by the convention delegates,[9] and it was this language that was ratified by the people of Louisiana in August 1868:
"All courts shall be open; and every person for injury done him in his lands, goods, person, or reputation, shall have adequate remedy, by due process of law, and justice administered without denial or unreasonable delay." La. Const. of 1868, Title I, Art. 10. (Emphasis added).
Therefore, while the initial adoption of this provision into Louisiana law may have been in imitation of another jurisdiction, this history suggests a considered decision to give this section meaning beyond reference to its common law sources. And when it is considered that, among all the state constitutions affording protection through similar language,[10] only Louisiana's specifically guarantees an "adequate" remedy, it can only be concluded that the addition of this qualifier was intended to protect the measure of relief to be found in our laws.
This protection has remained unaltered since 1868;[11] Article I, § 22 of the current constitution retains the basic language adopted over one hundred years earlier. While major modifications to the scope of this provision were considered and rejected at the 1973 Convention,[12] there is no evidence of any attempt to delete or change its reference to "an adequate remedy" as the measure of the relief to be guaranteed. Instead, the evidence indicates that the substance of this phrase was understood to be found in the existing legal system:
"Miss Wisham: Mr. Guarisco, would you elaborate a little more about `adequate remedy' for me, please? What does `adequate remedy' mean as related to this statement?

Mr. Guarisco: Well, whatever the remedy may be necessary for the particular action. An adequate remedy for personal injury might be a money compensation. Adequate remedy for someone expropriating somebody's property would be possibly to stop those persons from taking your property. It would depend on the nature of the cause of action whatever it may be, and then the judicial function would then take over and make that determination.
Miss Wisham: Good, thank you."[13]
The history of Article I, § 22 indicates that the protection afforded by this provision encompasses more than the mere right of access to the courts, as suggested in some of our prior decisions.[14] "Adequate remedy" and "due process" do not mean the same thing; "adequate remedy" is more than "due process."
The determination of the adequacy of recovery has always been part of the judicial function in Louisiana. The focus of the jurisprudence in this area, however, has been on the methods of measuring damages in individual cases, and on the standards of appellate review of those *310 awards.[15] Here, though, we are called upon to decide whether a process of recovery, established for a discrete category of tort victims, constitutes "an adequate remedy" under our constitution. One method by which we can measure this system is resort to the Civil Code, where there are general principles which give some meaning to the words "adequate remedy" in Article I, § 22.
The code's basic outline for the assessment of damages is found within the rules for conventional obligations.[16] First, "[d]amages are measured by the loss sustained by the obligee and the profit by which he has been deprived." C.C. 1995. The primary measure is the loss itself. Such losses include those of a nonpecuniary nature when the obligor knew, or should have known, that this type of damage would be caused by his breach. C.C. 1998.[17] But, "[w]hen damages are insusceptible of precise measurement, much discretion shall be left to the court for the reasonable assessment of these damages." C.C. 1999. So even if the extent of the loss sustained is not capable of exact proof, recovery of a reasonable amount is permitted, as determined within the factfinder's discretion.
Limitations on the measure of damages are also provided in our code. "An obligor in good faith is liable only for the damages that were foreseeable at the time the contract was made," C.C. 1996, while "[a]n obligor in bad faith is liable for all the damages, foreseeable or not, that are a direct consequence of his failure to perform." C.C. 1997.[18] Thus, the obligee must prove the causal link, as well as those circumstances indicating foreseeability, between the debtor's act and the creditor's injury. But "[a]ny clause is null that, in advance, excludes or limits the liability of one party for causing physical injury to the other party." C.C. 2004, 2d paragraph.
Although these codal principles appear within Title IV, which is concerned with conventional obligations, they are meant to be applied to other types of obligations when appropriate: "[t]he rules of this title are applicable also to obligations that arise from sources other than contract to the extent that those rules are compatible with the nature of those obligations." C.C. 1917. This would include the obligation to repair the harm caused to another by one's fault. C.C. 2315. In the latter case, it is again stated, "[i]n the assessment of damages in cases of offenses, quasi offenses, and quasi contracts, much discretion must be left to the judge or jury." C.C. 2324.1.
These rules therefore establish the standards to be met when a legal remedy takes the form of a monetary award. To be adequate, the amount awarded to a tort victim must not only cover those expenses arising from the injury, but also a reasonable compensation for the injury itself, including any injury to his nonpecuniary interests. And in an effort to ensure the proper fit between the injury and the recovery, this calculation is assigned as a function of the trier of fact, with much discretion allowed for the execution of this duty. Where physical injury has occurred, a prior agreement cannot act to restrict the measure of damages.
These standards suggest, above all, the attempt to achieve a balance between the harm done and the monetary award offered as a remedy. By specifying that the measure of damages shall be determined by the judge or jury who has viewed the evidence, recognition is given to the underlying principle that any recovery must be based upon proof: proof that the injury was a direct consequence of the delictual act, as *311 well as proof regarding the extent of the injury. Yet, even when proof is submitted and examined, valuation is recognized as presenting difficulties; "much discretion" is therefore granted to those performing this task. But without both consideration of the evidence and discretion in its assessment, there can be no measure of the adequacy of any amount in relation to the actual loss sustained.
This, then, is the meaning of Article I, § 22's guarantee that "every person shall have an adequate remedy:" a fault-based system of tort recovery must permit achievement of the overriding goal of balancing the monetary award received with the losses sustained. Where evidence is required as to the extent of injury as well as to prove entitlement to recovery, that evidence must be allowed to form the basis of the calculation of damages; otherwise, there can be no assurance of adequacy.
The case before us, however, demonstrates that the system of recovery established under the Medical Malpractice Act does not comport with these principles. By limiting all damage awards to $500,000, R.S. 40:1299.42(B)(1), prior to amendment, acts as a legislative determination that, in all cases, this amount represents a balanced compensation for any injury caused by a medical provider. Yet, the accumulated human and legal experience expressed in our Civil Code, and protected by Article I, § 22, indicates that such balance can only be attained through consideration of the evidence in each case by the trier of fact. While every victim of medical malpractice is required to prove the extent of his injury, the judge or jury assessing that proof is deprived of the discretion to provide "every person [with] an adequate remedy." Therefore the recovery limitation of R.S. 40:1299.42(B)(1), prior to its amendment by Act 435 of 1984, violates the constitutional provision for "an adequate remedy."[19]
This is not to say that under Article I, § 22 of the Louisiana Constitution there is no room for legislative action regarding the rights and remedies that are to be applied by the judiciary. In this state, the law springs from legislation and custom, and not the courts. C.C. 1. The interpretation urged here would not restrict the legislature's authority to define the nature of relief to be granted when a legally cognizable harm has occurred. But where a cause of action has been recognized in the law, the measure of the remedy provided, in whatever form, must meet the constitutional mandate of adequacy.
The PCF and intervenors argue, however, that this interpretation is in conflict with our earlier holdings under Article I, § 22 and its constitutional predecessors, citing Colorado v. Johnson Iron Works, 146 La. 68, 83 So. 381 (1919), Everett v. Goldman, 359 So.2d 1256 (La.1978), Bazley v. Tortorich, 397 So.2d 475 (La.1981), Sibley v. Board of Supervisors of LSU, 462 So.2d 149 (La.1985) (on original hearing), and Crier v. Whitecloud, 496 So.2d 305 (La.1986). As earlier noted,[20] there is no such conflict; the provisions challenged in these cases involved, for the most part, the guarantee of access to the courts found in this Section, rather than the measure of a remedy.
Thus, in Everett it was held that neither the requirement of a medical malpractice review process prior to filing suit, nor the prohibition of ad damnum clauses in such suits, unreasonably deprived a claimant of his access to the courts. Significantly, it was noted there that "these provisions do not restrict plaintiff's recovery. In all cases which go to trial the judge or jury *312 remain (sic) the final arbiter of factual questions concerning liability and quantum."[21]
Similarly, this court determined in Bazley that a legislative expansion of tort immunity under the exclusive remedy provision of workers' compensation did not "substantially alter a claimant's access to the judicial process"[22] and thus was not violative of Article I, § 22. And in Crier it was held that, because this constitutional provision did not guarantee a remedy for every injury, a statute limiting the prescriptive period for medical malpractice claims meant only that, after the specified time, there was no cause of action for which the courts must be opened.[23] These cases did not directly involve the measure of relief provided.
Admittedly, both Colorado and Bazley can be read as presenting, however indirectly, the claim that because the exclusive remedy provision of the workers' compensation statute denies an injured worker (or his dependent) the right to sue in tort for general damages, no "adequate remedy" is provided there. But the interpretation of Article I, § 22 proposed here would not require a different result in those cases, as the workers' compensation scheme differs in many respects from the fault-based system of recovery at issue here. It is not necessary to find that this constitutional provision demands the same remedy for all injuries, but only that, considering the system as a whole, the relief provided meet the test of adequacy. Where different features are present a different balance may be obtained.
Of the cases cited by the PCF and intervenors, only in Sibley was this court presented with a direct limitation on the amount of recovery, as here. In our original opinion, however, we again identified the Article I, § 22 challenge as one of due process alone. Following Bazley and Everett, federal standards of due process analysis were applied to decide that this constitutional provision was not violated. While our opinion on rehearing[24] rejected the use of federal equal protection jurisprudence to interpret the different language of Article I, § 3 of our constitution, we did not similarly reconsider our analysis of § 22. To the extent that our opinion on original hearing in Sibley represents that this provision protects only a right to due process and access to the courts, it should be overruled.
The limitation on damages found in R.S. 40:1299.42(B)(1) established a system of recovery that distinguished between medical malpractice victims based upon the extent of injury suffered. While this classification would reasonably serve to control medical providers' insurance costs and thus relieve the "crisis" seen to exist in 1975, our constitution protects interests in addition to the equal dignity of its citizens. In this case, the legislative enactment in question, however reasonable, results in a violation of Article I, § 22's guarantee that "every person shall have an adequate remedy," and therefore should not be allowed to stand.
DENNIS, Justice, dissenting.
I respectfully dissent. In its eagerness to avoid the difficult question we granted certiorari to decide some fifteen months ago, the constitutionality of the $500,000 cap, the court has created even more difficult issues for the judiciary and the medical profession in the future.
The court finds that the issue of the constitutionality of the statutory scheme providing a $100,000 cap (for providers) and a $500,000 cap (on total recovery) is moot because the plaintiff settled with the defendant physician. After the settlement agreement was confected, plaintiff's action against the physician was dismissed with prejudice. The doctor is not before this court to plead his settlement by the exception *313 of res judicata. Civil Code art. 3078. By holding the settlement binding on the plaintiff in the absence of the physician, however, the Court has established precedent for courts to supply the exception of res judicata ex proprio motu, in direct contravention of Code of Civil Procedure article 927. The issue is simply not presented to the court for a decision on mootness or any other grounds. The court's focus on the $100,000 cap, however, is symptomatic of its fundamental misperception of the way the medical malpractice statute is structured. The per curiam treats the $500,000 cap as an incidental consequence of capping provider liability at $100,000 and the Patient Compensation Fund's liability at $400,000. The statute itself, however, does not mention this $400,000 cap. Rather, this phantom cap is nothing more than the consequence of limiting provider liability to $100,000 (La.R.S. 40:1299.42(B)(2)) and overall liability to $500,000 (La.R.S. 40:1299.42(B)(1)). The constitutionality of the $500,000 cap is what we granted certiorari to determine, and this question is anything but moot.
Rather than deciding the question we granted certiorari to consider, the court gratuitously declares unconstitutional a classification of medical expense claimants without analysis. The per curiam opinion disapproves of the Legislature's failure to make the exclusion of medical expenses from the cap retroactive for private sector claims as it had done for public sector claimants, but the court does not precisely identify the classification it finds unlawful or the particular part of the equal protection clause that has been offended. The court does not reveal the level of scrutiny it has brought to bear on the statute; nor does it disclose why any of the state interests that readily might be associated with the legislation are invalid or offer the state or other proponents of the legislation an opportunity to demonstrate that the statute substantially furthers a valid state purpose. Persons with claims against the state are often treated differently than those with claims against private parties. See, e.g., La.R.S. 9:2800 (state not liable under Civil Code art. 2317 absent actual knowledge); La.R.S. 13:5105 (no jury trial against the state); La.R.S. 13:5106 (general damages limited to $500,000). The court's cryptic pronouncement casts a shadow of constitutional doubt on these and other statutes, as well as the legislature's ability to change prescriptive periods, create new causes of action, and enhance statutory benefits and entitlements without making such acts retroactive. The most fundamentally objectionable part of the court's opinion, however, is its substitution of an imaginary $400,000 limitation as an easily confuted straw man, rather than tackling the hard question of the constitutionality of the $500,000 cap. The court "upholds" the constitutionality of a $400,000 cap on the liability of the Patients' Compensation Fund despite the facts that (1) there is no such limitation in the statute, (2) the plaintiff did not attack this fictional provision, and (3) the plaintiff would not have had standing to attack the provision (if it existed) under the court's theory that such a limitation would not infringe upon his rights. See Vieux Carre Property Owners and Associates v. City of New Orleans, 246 La. 788, 167 So.2d 367 (1964). The majority analogizes the Fund to an excess insurer that provides coverage for liability between $100,000 and $500,000, and then reasons that the state is free to limit the coverage of insurance it provides. The state, however, has not limited any insurance coverage; it has only placed a $500,000 limit on the amount of damages an malpractice victim can recover.
In its form relevant to this case, La.R.S. 40:1299.42(B) consists of three subsections. Subsection (1) provides that the "total amount recoverable" in a malpractice action cannot exceed $500,000. Subsection (2) states that a qualified health care provider "is not liable for an amount in excess of one hundred thousand dollars" for malpractice. (Emphasis added.) Finally, the third subsection provides that "[a]ny amount due" from a judgment or settlement "which is in excess of the total liability of all liable health care providers ... shall be paid from the patient's compensation fund...." (Emphasis added.)
*314 The analogy of the fund's liability to that of an excess insurer is imperfect in at least two respects. First, the statute provides that the primary tortfeasor "is not liable" for amounts over $100,000. It is elementary insurance law that a liability insurer is obligated to pay only those debts for which its insured is liable; the statute here creates a sui generis kind of liability on the part of the fund. The second, fatal flaw in the court's reasoning is in assuming that the statute limits the fund's liability. It does not. Rather, it obligates the fund to pay "any amount due" in excess of the tortfeasors' liability. The limitation of $500,000 is a limitation on the "total amount recoverable," and the limitation of the fund's liability is merely a consequence of the $500,000 limitation on recoverable damages.
The case from other jurisdictions cited by the court are not persuasive, because those states' statutes are simply different from our own. The Nebraska statute reads in part, "The total amount recoverable ... from ... the Excess Liability Fund ... may not exceed [$1,000,000]." Neb.R.S. § 44-2825(1). While this limits the amount recoverable, it also explicitly caps the liability of the excess fund. No such explicit cap is found in our statute. The Kansas statute construed in Kansas Malpractice Victims v. Bell, 243 Kan. 333, 757 P.2d 251 (1988), limits malpractice liability to $1,000,000, which is to be paid by the health care provider. Kan.Stat.Ann. § 60-3407. If, however, economic loss exceeds this amount, the claimant may petition the court for "supplemental benefits." These supplemental benefits, combined with the amount received from the physician, may not exceed $3,000,000, and are payable only from the health care stabilization fund. Kan.Stat.Ann. § 60-3411. The statute thus creates a separate obligation that may be satisfied solely from the health care stabilization fund, and it specifically limits the obligation of the fund to the stated amount. This changed prior Kansas law, for the Kansas Supreme Court stated:
If the plaintiff successfully petitions the court under [this] provision, the Fund can be held liable for up to the full amount of the jury's award of damages, not exceeding $3,000,000. Should a plaintiff be awarded a $6,000,000 judgment, only $3,000,000 of it could possibly come from the Fund. Prior to 1984, the Fund would have covered the entire amount. 757 P.2d 255-56.
Thus the Kansas and Nebraska statutes limit the liability of the funds to specific ceilings. In contrast, our statute provides that the Patient's Compensation Fund is liable for all amounts recoverable, while purporting to limit that amount separately.
This distinction is analytically important. Rather than being a simple "policy limit" as it is treated in the court's opinion, the limitation is one on the rights of the injured patient. It thus gives the plaintiff standing to challenge the limit, and presents the constitutional issue the court is straining to avoid. Perhaps more importantly, because the liability of the fund is not limited, a finding that the $500,000 cap is unconstitutional would render the fund liable for excess damages.
The court's improper interpretation of the statute creates further uncertainty in this area. While the per curiam decision may preordain a decision that the PCF does not protect a doctor from a judgment in excess of $500,000, it does not decide the question, and no one can be certain that a more thorough consideration might not produce a different result. Since the per curiam leaves in question both the constitutionality of the $500,000 cap and the scope of the PCF's protection, health care providers will feel the need to purchase malpractice coverage in excess of $500,000. By the time we decide these issues, one or both sides in this debate will have suffered a grave injustice. If we should ultimately decide that the $500,000 cap is constitutional, the medical community will have been forced to purchase insurance coverage that is essentially useless, and some plaintiffs will have incurred litigation expenses that could have been avoided by amicable settlement for the limit. If we decide it is unconstitutional yet follow the interpretation foreshadowed by today's per curiam, then both health care providers who do not presently *315 have excess coverage and those who cannot obtain it in the future will find themselves underinsured, to the detriment of both themselves and their victims. Finally, if we decide the cap is unconstitutional and reject today's foreordination, then any excess insurance coverage purchased will have again been useless and, most importantly, this court will have invidiously inflicted an irreparable injury upon Mark Williams.
NOTES
[1] LSA-R.S. 40:1299.42.
[2] LSA-R.S. 40:1299.42B(2).
[3] Act No. 435 of 1984; LSA-R.S. 40:1299.43.
[4] The doctor was released together with all "related companies and/or parties and employees...." The language apparently referred to Dr. Herman R. Cohen, with whom Dr. Kushner operated "A Professional Medical Corporation."

Dr. Cohen and the corporation were not included in the later proceedings.
[5] Williams on Behalf of Williams v. Kushner, 449 So.2d 455 (La.1984).
[6] Sibley v. Board of Suprs of Louisiana State University, 477 So.2d 1094 (La.1985).
[7] Williams v. Kushner, 524 So.2d 191 (La.App. 4th Cir.1988).
[8] 526 So.2d 785 (La.1988).
[9] See also Prendergast v. Nelson, 199 Neb. 97, 256 N.W.2d 657 (1977).
[10] Act 239 of 1985: LSA-R.S. 40:1299.39.
[11] LSA-Const. Art. I, § 3 provides:

No person shall be denied the equal protection of the laws. No law shall discriminate against a person because of race or religious ideas, beliefs, or affiliations. No law shall arbitrarily, capriciously, or unreasonably discriminate against a person because of birth, age, sex, culture, physical condition, or political ideas or affiliations. Slavery and involuntary servitude are prohibited, except in the latter case as punishment for crime.
[12] See Appendix I.
[1] Compare Sibley v. Board of Suprs of Louisiana State University, 477 So.2d 1094 (La.1985).
[2] The medical malpractice legislation was repealed but Idaho now has a $400,000 ceiling on all noneconomic damages.
[3] 811 F.2d 270 (5th Cir.1987).
[1] The issue of the applicability in this case of the exclusion of medical and related expenses from the $500,000 limitation arises from the decision that the constitutional issue regarding the limitation is not before the court.
[2] In the St. Charles Parish School Board case this court stated:

A "justiciable controversy" connotes an existing actual and substantial dispute, as distinguished from one that is merely hypothetical or abstract, and a dispute which involves the legal relations of the parties who have real adverse interest and upon which the judgment of the court may effectively operate through a decree of conclusive character.
A justiciable controversy is thus distinguished from a difference or dispute of a hypothetical or abstract character; from one that is academic or moot. The controversy must be definite and concrete, touching the legal relations of parties having adverse legal interests. It must be a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts. If the case is moot "there is not subject matter on which the judgment of the court can operate". For these purposes a "moot" question connotes an issue that has be "deprived of practical significance" or "made abstract or purely academic."
The doctrine that courts will not hear moot cases serves two complementary purposes: it prevents the useless expenditure of judicial resources and assures that the courts will not intrude prematurely into policymaking in a manner that unnecessarily constrains the other branches of government. Mootness should therefore properly be regarded as rooted in part in the separation of powers, although its application is rooted as well in a rule of self restraint on the theory that the state should not be burdened with expense of litigating insubstantial controversies.
It is fundamental in our law that courts sit to administer justice in actual cases and that they do not and will not act on feigned ones, even with the consent of the parties. The duty of this court, as of every judicial tribunal, is limited to determining rights of persons or of property which are actually controverted in the particular case before it. When in determining such rights, it becomes necessary to give an opinion on a question of law, that opinion may have weight as a precedent for future decisions. But the court is not required to decide moot questions or abstract propositions, or to declare, for the government of future cases, principles or rules of law which cannot affect the result as to the thing in issue in the case before it.
Id. at 1171, 1173 (citations omitted).
[3] If plaintiff were attempting to get a judgment against the released health care provider in excess of the statutory limitation, then the concept of res judicata would come into play, and that exception can only be raised by the parties under La.C.C.P. art. 927. However, plaintiff is attempting to obtain a judgment in excess of the limitation only against PCF. Once this court determines that the limitation of PCF's liability is $400,000 and that the limitation of PCF's liability does not violate any constitutional principles, then the claim must be dismissed, not on the basis of res judicata, but on the basis of lack of a justicible controvery.

Res judicata is somewhat implicated because the validity of the release of the health care provider is impliedly necessary for this court to determine that there is no justicible controversy between the remaining parties in the lawsuit. However, no one has questioned the validity of the compromise, and res judicata principles are not applicable.
[4] As with any other legislation, La.R.S. 40:1299.42(B)(2) must be interpreted as a whole. One cannot reasonably say that the Legislature intended for the express $500,000 limitation on total recovery to stand if the express $100,000 limitation on health care providers is struck down as unconstitutional, or intended for the equally clear $400,000 limitation on the PCF to stand if the other two are struck down. These subsections are clearly not severable.
[1] The statute caps the cumulative liability of the health care provider and Patient's Compensation Fund at $500,000 while limiting the liability of a single health care provider to $100,000, thus effectively limiting the Fund's maximum exposure to $400,000. La.R.S. 40:1299.42(B)(1)(3).
[2] That statute provides that "an annual surcharge shall be levied" on all qualified health care providers. "The surcharge shall be determined by the Louisiana Insurance Rating Commission based upon actuarial principles and shall not exceed twenty percent of the cost to each health care provider for maintenance of financial responsibility." La.R.S. 40:1299.44(A)(2).
[1] This problem was addressed by the passage of Acts 1975, No. 808, which requires that all medical malpractice suits be filed, at the latest, "within... three years from the date of the alleged act, omission or neglect." R.S. 9:5628 A.
[2] W.F. Swindler, Magna Carta: Legend and Legacy 223-24 (1965).
[3] Alabama, Arkansas, Colorado, Connecticut, Delaware, Florida, Idaho, Illinois, Indiana, Kansas, Kentucky, Maine, Maryland, Massachusetts, Minnesota, Mississippi, Missouri, Montana, Nebraska, New Hampshire, North Carolina, North Dakota, Ohio, Oklahoma, Oregon, Pennsylvania, Rhode Island, South Carolina, South Dakota, Tennessee, Texas, Utah, Vermont, West Virginia, Wisconsin, and Wyoming.
[4] Debates in the 1864 (La.) State Constitutional Convention 397 (New Orleans 1864) (available in the Louisiana Supreme Court Library).
[5] Official Journal of Proceedings, 1867-68 (La.) Const. Convention 36 (New Orleans 1868) (available in the Louisiana Supreme Court Library).
[6] Official Journal, supra at 41.
[7] Official Journal, supra at 97.
[8] Official Journal, supra at 85.
[9] Official Journal, supra at 119.
[10] See note 3, supra; some provisions indicate that a "certain" or a "speedy" remedy is guaranteed, but most simply provide that all persons "shall have remedy."
[11] See La. Const. of 1879, Art. 11; La. Const. of 1898, Art. 6; La. Const. of 1913, Art. 6; La. Const. of 1921, Art. I, § 6.
[12] See Vol. VII, Records of the La. Const. Convention of 1973: Convention Transcripts, pp. 1218-22 (9/12/73).
[13] Vol. VII, Records, supra p. 1218.
[14] See, e.g., Crier v. Whitecloud, 496 So.2d 305, 309-10 (La.1986); Sibley v. Board of Supervisors of LSU, 462 So.2d 149, 157, modified on rehearing, 477 So.2d 1094 (La.1985); Bazley v. Tortorich, 397 So.2d 475, 485 (La.1981); Everett v. Goldman, 359 So.2d 1256, 1268-69 (La.1978). See also discussion of these cases below.
[15] See Reck v. Stevens, 373 So.2d 498 (La.1979) and the cases cited therein.
[16] The code articles will be cited by their current numbers, rather than those found in previous enactments, for ease of reference. These principles have not been changed since the Civil Code of 1825 was adopted, and there is therefore no need to distinguish between provisions in effect at any particular time.
[17] See the revision comments to this article, as well as Litvinoff, Moral Damages, 38 La.L.Rev. 1 (1977), cited therein; see also Tete, Tort Roots and Ramifications of the Obligations Revision, 32 Loy.L.Rev. 47, 96-125 (1986).
[18] See Tete, supra n. 17, 56-64.
[19] We must take notice here of the extensive opinion testimony elicited in the trial court to the effect that this ruling will result in bankruptcy of the PCF, as currently financed. With a $22,848,872.10 balance in the fund as of February 28, 1986 (Record, PFC exh. 7, p. 16), it would appear that such bankruptcy is not imminent. Since there was also substantial testimony indicating that, since 1975, medical malpractice insurance coverage for amounts in excess of $500,000 has again become available and is, in fact, being carried by a significant proportion of Louisiana's health care providers, the legislature may wish to consider a reallocation of the liability for damages between the PCF and its participating providers; time for such consideration appears available.
[20] See discussion at n. 14.
[21] Everett, 359 So.2d at 1269 (emphasis added).
[22] Bazley, 397 So.2d at 485.
[23] I dissented from that decision, being of the opinion that there is no "adequate remedy" where a prescriptive period is allowed to expire before the injury could reasonably be discovered. Crier, 496 So.2d at 313.
[24] 477 So.2d 1094 (La.1985).