806 So.2d 10 (2001)
Alfreda Smith MILLER, Wilbert Miller, Sr., Edwina Greene, Wilbert Miller, Jr., Marie Davillier and Patrice Brookter
v.
SOUTHERN BAPTIST HOSPITAL.
No. 2000-CA-1352.
Court of Appeal of Louisiana, Fourth Circuit.
November 21, 2001.
Writ Denied March 28, 2002.
*13 C.A. Fleming, III, Fleming & Rosamond, L.L.P., Metaire, LA, Counsel for Plaintiff/Appellee.
Corinne Ann Morrison, Heather M. Valliant, James C. Young, Keith C. Armstrong, Chaffe, McCall, Phillips, Toler & Sarpy, New Orleans, LA, Counsel for Defendant/Appellant.
Court composed of Judge JAMES F. McKAY III, Judge TERRI F. LOVE, Judge MAX N. TOBIAS, Jr.
LOVE, Judge.
The Louisiana Patient's Compensation Fund appeals the judgment of the trial court's judgment granting a Judgment Notwithstanding the Verdict (JNOV). The jury awarded $400,000 for mental pain and emotional anguish. Upon granting the JNOV filed by Plaintiffs, the trial court judge maintained the jury's verdict and *14 additionally awarded damages for physical pain and suffering ($250,000), past lost wages ($99,614), loss of future earning capacity ($101,150), past medical expenses ($393,636.09) and future medical care. The trial court further awarded damages for loss of consortium to Plaintiffs husband and daughter in the amount of $15,000 each and two other daughters in the amount of $20,000 each. For the reasons explained below, we affirm both the trial court's decision granting the JNOV and the award of damages because the record clearly shows that Defendant admitted liability and is therefore liable for the resultant damage.

FACTS AND PROCEDURAL HISTORY
In January of 1979, Dr. James Dowling ("Dr. Dowling") performed surgery at Southern Baptist Hospital on Plaintiff, Alfreda Miller (Mrs. Miller), to remove her gall bladder and correct some gastrointestinal problems. During the surgery, Mrs. Miller alleges that she received four pints of blood. In December of 1994, Ms. Miller tested positive for Hepatitis-C virus. In 1995, Mrs. Miller began receiving treatment for the Hepatitis-C virus in the form of Interferon. As a result of the Interferon treatment, she developed dermatomyositis, which is an auto-immune disease. On December 8, 1995, Mrs. Miller, her husband, Wilbert Miller, Sr. ("Mr. Miller") and her four children, Edwina Green, Wilbert Miller, Jr., Marie Davillier, and Patrice Bookster filed suit against Southern Baptist Hospital ("SBH"), alleging that SBH was negligent for failing to test blood that she allegedly received during a blood transfusion in 1979.
SBH settled with Plaintiffs for the statutory maximum amount of $100,000. The Louisiana Patient's Compensation Fund ("LPCF") paid the $100,000. Plaintiffs sought damages in excess of the $100,000 and proceeded with a jury trial against Southern Baptist Hospital.
At trial, Plaintiffs proposed two possible theories to explain Mrs. Miller's dermatomyositis condition. Foremost, they argued that the increase of the Interferon dosage caused the dermatomyositis to develop. Alternatively, they argued that Mrs. Miller had a pre-existing auto-immune disease that became exacerbated by the Interferon increase and caused her to develop dermatomyositis. Under either scenario, Plaintiffs argue that Defendant is liable for any and all damages that resulted from both the Hepatitis-C infection and the dermatomyositis.
At trial, the testimony of the physicians adduced the following:

Dr. Pedro Serrant
Dr. Serrant, Mrs. Miller's primary care physician, testified that he first saw Mrs. Miller in November, 1994, when she came to the emergency room due to chest pain. At that time, he noted that her liver enzymes were elevated and also learned that she had received a blood transfusion in 1979. In December of 1994, suspecting that she may have hepatitis, he conducted a hepatitis panel. Subsequently, Dr. Serrant diagnosed Mrs. Miller with the Hepatitis-C virus and referred her to Dr. Gopal, a gastroenterologist. Dr. Gopal did a Hepatitis-C virus test and a liver biopsy, which confirmed Dr. Serrant's diagnosis. Further, the liver biopsy showed that Mrs. Miller had chronic active hepatitis, which is indicated by chronic inflammation and necrosis of the liver tissue.
In February, 1995, she began treatment for the Hepatitis-C virus and began receiving 3 million units of Interferon three times per week. Interferon is a drug that is used to boost or strengthen the immune system, helping to combat the Hepatitis-C virus. Approximately one year later, Dr. Gopal noted that Mrs. Miller still had the *15 Hepatitis-C virus in her blood and increased her Interferon dosage to 5 million units, five times per week. Shortly thereafter, Mrs. Miller complained of pain in her legs; however, at that time, Dr. Serrant was unable to uncover the reason for the pain. As of March, 1996, she continued to have pain and her skin exhibited a reddish rash. She was diagnosed with leg myalgia. Furthermore, Dr. Serrant noted that her sedimentation rate and rheumatoid factors were elevated. Therefore he recommended that she see a rheumatologist.
Dr. Sedrish, a rheumatologist, conducted a rheumatological evaluation, which tested positive. He noted that in 1993, prior to the Interferon treatment, Mrs. Miller had a negative rheumatoid factor. Dr. Sedrish reported that both the rheumatoid factor and sedimentation rates were due to the Hepatitis-C virus. After still experiencing joint pain and swelling of the hands, knees and ankles, Mrs. Miller remained under the care of Dr. Sedrish.
In April of 1996, Dr. Serrant noted that the rash on Mrs. Miller's body had spread and was becoming more aggravated, so he referred her to Dr. McBurney, a dermatologist. Dr. McBurney diagnosed Mrs. Miller with dermatomyositis. In May of 1996, after the aforementioned symptoms persisted, Mrs. Miller was admitted to the hospital. At this time she also was malnourished and suffered difficulty swallowing. Upon her admission to the hospital, Dr. Serrant halted the Interferon treatment, because he and the other physicians suspected that it was related to her multiple ailments. Simultaneously, Mrs. Miller began steroid treatment, which was prescribed to suppress the immune system and thus, relieve her of the dermatomyositis symptoms. Unfortunately a counter effect of the suppression of the immune system was that it would allow the Hepatitis-C virus to flourish. Nonetheless, Dr. Serrant assessed that the dermatomyositis was more problematic than the Hepatitis-C and would cause morbitity; thus, it needed to be treated more aggressively then the Hepatitis-C virus.
After ceasing the Interferon treatments Mrs. Miller continued to suffer the rash on her body, muscle weakness and joint pain. In June of 1996, she was re-hospitalized for dehydration, vomiting and quadriparesis, which is paralysis of the four extremities. After remaining in the hospital for two weeks, she was discharged from the hospital and underwent physical therapy and occupational therapy. Additionally, during the admission, she was diagnosed with depression and was prescribed the anti-depressant, Zoloft.
In August of 1996, she was readmitted to the hospital because she had suffered difficulty swallowing, chronic swelling and elevated CPK levels. Consequently, Mrs. Miller was prescribed Methotrexate, an immuno-suppressant, which is typically used in cancer chemotherapy. She was discharged in October of 1996 and Dr. Serrant prescribed home healthcare for her because she was incapable of taking care of herself.
Throughout the remainder of 1996, Mrs. Miller continued to see Dr. Serrant and Dr. Sedrish. Despite the Methotrexate treatment, she still complained of joint pain and a rash; however, the swelling that she had previously complained of had decreased. In December of 1996, Dr. Serrant noted that Mrs. Miller's condition had improved somewhat; however, she was still experiencing a rash and some swelling. Not long thereafter, she was admitted to the hospital in January of 1997 for swelling of the mouth, difficulty swallowing and dehydration. Dr. Serrant diagnosed her with gastroesophageal reflux and candidiasis infection of the mouth. Due to the *16 gastroesophageal reflux condition, he had a PEG tube inserted in Mrs. Miller so that she could still receive nutrition even though she could not eat. After remaining in the hospital for a month and a half, Dr. Servant discharged her to a hospice because her health was so poor that he did not expect her to survive longer than six months.
Dr. Serrant next saw Mrs. Miller in February of 1997. At this point, she had been experiencing some abdominal and rectal bleeding due to a urinary tract infection. During this visit Dr. Serrant reevaluated the medication that Mrs. Miller was receiving. At that time, she was taking Pepcid to reduce the acid in the stomach, Diflucan for the candidiasis infection in the mouth, Prednisone, a steroid, to suppress the immune system, Zoloft for depression, both Duragesic and Dilaudid for chronic pain, Methotrexate for suppression of the immune system, medication for anxiety, and multi-vitamins for nutrition.
Eventually, after seven months in the hospice, Mrs. Miller was discharged.
At a subsequent July of 1997 visit, Mrs. Miller was diagnosed with osteoporosis and hyperglycemia, both of which Dr. Servant attributed to the steroid treatment. At this office visit, Mrs. Miller still continued to suffer from the rash, gastroesophageal reflux and the recurrent urinary tract infections.
In November of 1997, Mrs. Miller was again admitted to the hospital for pneumonia. She was discharged in December, whereupon Dr. Serrant referred her to Dr. Collins, an ophthalmologist. Dr. Collins diagnosed her with diabetic retinopathy, which Dr. Serrant testified was caused by the hyperglycemia, resulting from the steroid treatment.
During cross-examination, Dr. Serrant testified that it was usually uncommon for Hepatitis C to directly cause dermatomyositis. He stated that during his treatment of Mrs. Miller, he learned that her sister had lupus, an auto-immune disease. He further testified that due to this fact, there was a possibility that Mrs. Miller had a pre-existing auto-immune condition, such as dermatomyositis, that remained asymptomatic until the Interferon treatment.
In both February of 1998 and February of 1999, Mrs. Miller was hospitalized for congestive heart failure. Upon cross examination concerning Mrs. Miller's congestive heart failure, Dr. Serrant conceded that although dermatomyositis can contribute to this condition, Mrs. Miller had a number of predisposing factors which could attribute to her heart problem. For example, she had hypertension, a forty year history of smoking and a family history of coronary disease.
Lastly, Dr. Serrant testified that although the dermatomyositis was "controlled," at the time of trial, Mrs. Miller still suffered from rashes, body aches, swelling and immobility of her arms and legs. He also stated that she would need ongoing treatment and medication to alleviate her symptoms.

Dr. Dasrathy Srinivas
Dr. Srinivas, a gastroenterologist, agreed with Dr. Serrant, that Mrs. Miller's dermatomyositis could have resulted from the Interferon treatment or a pre-existing auto-immune disease. Additionally, he raised the possibility that the Hepatitis-C virus itself directly caused the rash to develop.
Dr. Srinivas was asked about the progression of the Hepatitis-C virus when, as in Mrs. Miller's case, the patient is on steroids to suppress the immune system. To this question, Dr. Srinivas responded that she would be subjected to the rapid *17 progression of the virus because of her disabled immune system. He testified that her RNA test was at 8,760 copies of the virus per milliliter in 1996 (when she was on Interferon) and 390,000 copies of the virus per milliliter in 1999 (after she was taken off of Interferon). Thus, he stated that this was indicative of the rapid progression of the Hepatitis-C virus.
Dr. Srinivas also prognosticated that based upon the steroid treatment and the lack of treatment for Hepatitis-C, Mrs. Miller would most likely develop chronic active hepatitis and eventually cirrhosis of the liver. He estimated that approximately 70 percent of Hepatitis-C patients develop chronic liver disease. He also testified that cirrhosis of the liver is often accompanied by other health complications, such as the development of ascites, which is intraperitoneal fluid in the abdomen that must be removed by a needle aspiration. Further, as a result of cirrhosis, it is possible that she will develop varices, which are abnormal blood vessels in the gastrointestinal tract. Other possible complications include hepatic encephalopathy, spontaneous bacterial peritonitis and liver cancer.
Dr. Srinivas also testified that due to her compromised liver, she should have a liver biopsy at least once every few years to determine whether she has developed cirrhosis. Other than Interferon and a transplant, he testified that there is no other therapeutic alternative for Mrs. Miller's Hepatitis-C. As such, he stated that she will definitely require future care and treatment.

Dr. William Grant
Dr. Grant, who specializes in internal medicine and infectious diseases, reiterated Dr. Srinivas' three possible theories of explanation for Mrs. Miller's dermatomyositis condition.
When questioned about the possible side effects concerning a Hepatitis-C patient, Dr. Grant testified that they include hypertension, diabetes, skin thinning, opthamological changes (such as cataracts) and adrenal suppression, which causes immunological types of problems. Further, he stated that the steroids placed Mrs. Miller at risk for osteonecrosis, which is the destruction of the bone. In concluding his testimony, he stated that in the future, the potential problems that Mrs. Miller might suffer are recurrent pneumonia and decubital ulcers, which are prone to infection.

Dr. Paul Gaglio
Dr. Gaglio, a hepatologist, testified that Mrs. Miller only had a mild liver injury and since she did not consume alcohol, it would take her decades to develop cirrhosis. He also added that many patients never develop cirrhosis or complications of liver disease. Additionally, he reported that approximately 15% of patients infected with the Hepatitis-C virus spontaneously rid themselves of the infection without treatment. Of the remaining infected population with the virus, approximately 30-40% will develop cirrhosis of the liver, 15% will develop liver cancer and approximately 18-20% will develop complications that require either therapy or transplants.
Further, Dr. Gaglio testified that since Mrs. Miller's had elevated levels of the muscle enzyme CPK and her sister had lupus, these were indications that she may have had a pre-existing auto-immune disease. He further stated that from analyzing Mrs. Miller's biopsy, she most likely had been afflicted with auto-immune hepatitis. He stated that patients with auto-immune hepatitis often have abnormal liver tests because the disease causes liver injury.
Dr. Gaglio additionally explained that ALT is an enzyme produced by the liver, which allows it to function properly. An *18 ALT test measures the amount of ALT, and an elevated ALT test indicates that there is damage to the liver. Dr. Gaglio stated that since Mrs. Miller had been receiving the steroid, Prednisone, her ALT levels have normalized. He stated that since Prednisone is typically used to treat auto-immune Hepatitis-C, this is further indicative of the fact that Mrs. Miller was already inflicted with this disease.

DISCUSSION
Defendant, LPCF, raises four issues on appeal. Defendant argues: 1) Plaintiffs' claim is perempted under La. R.S. 9:5628; 2) Plaintiffs failed to prove that SBH's alleged malpractice caused damages in excess of $100,000; 3) The trial court erred in refusing to allow the jury to determine whether Miller merely lost a chance of receiving untainted blood; and 4) The trial court erred in granting the JNOV and the jury's original verdict should be reinstated.
Defendant's first assignment of error alleges that Plaintiffs' lawsuit has prescribed and is perempted by Louisiana Revised Statute 9:5628. In response, Plaintiffs argue that this lawsuit is not perempted and further, Defendant does not even have standing to raise this issue.
This assignment of error involves a question of law. Appellate review of a question of law is simply a decision as to whether the trial court's decision is legally correct or incorrect. Jim Walter Homes, Inc. v. Jessen, 98-1685 (La.App. 3 Cir. 3/31/99), 732 So.2d 699. If the trial court's decision is based on its erroneous application of law, rather than on the valid exercise of discretion, its decision is not entitled to deference by the reviewing court. Kem Search, Inc. v. Sheffield, 434 So.2d 1067 (La.1983). When an appellate court finds that a reversible error of law is made in the lower court, it must redetermine the facts de novo from the entire record and render a judgment on the merits. Lasha v. Olin Corp., 625 So.2d 1002 (La.1993).
In support of its contention that Defendant does not have standing to raise the issues of prescription and peremption, Plaintiffs rely on Rey v. St. Paul & Marine Ins. Co., 95-3033 (La.3/22/96), 669 So.2d 1223, which held that the LPCF could not raise the issues of prescription and peremption if the health care provider has already paid the $100,000 settlement amount. Defendant advances that Rey has been overruled by Graham v. Willis-Knighton Medical Center, 97-0188, (La.9/9/97), 699 So.2d 365, wherein the court's decision somehow expanded the LPCF's right to raise defenses and objections to medical malpractice claims, other than those defenses related to damages.
Prior to trial, Defendant filed an Exception of Prescription and Peremption. The trial court denied the exception and Defendant sought writ review from this Court. Upon review, we found that Graham did not overrule Rey. Rey held that under La. R.S. 40:1299.44 C(5), the LPCF is precluded from asserting prescription or peremption after the medical provider's $100,000 settlement. See Alfreda Miller, et al. vs. Southern Baptist Hospital, 98-2753, unpub., (La. 4 Cir. 12/29/98), writ denied, 99-0253 (La.3/26/99), 739 So.2d 800. After reviewing the arguments on this issue once again, we maintain our previous position and reiterate that we find nothing in Graham that overrules the court's holding in Rey in regards to the LPCF capacity to raise the issues of prescription and peremption after settlement has already occurred.
In Rey, the plaintiff and the hospital agreed to settle for the statutory maximum of $100,000. See Id. at p. 2. The plaintiff then filed a petition for judicial approval of the settlement and also made a *19 demand for additional payment amounts from the Fund. The Fund objected to the approval of the settlement on the basis that it has prescribed. The trial court sustained the Fund's objection. However, on appeal, this Court held that once the Fund had paid its policy limits, statutory liability was admitted and the Fund had no standing to raise the issue of prescription.
In Graham, similarly, the plaintiff and health care provider settled for $100,000. See Id. The Louisiana Supreme Court held that the $100,000 payment by the LPCF served as an admission of liability for damages only up to the settlement amount. However, the court stated that $100,000 payment did not serve as an admission of liability for any and all damages sustained by the plaintiff. The court held that at trial, if the plaintiff seeks a judgment in excess of that $100,000 settlement, then the plaintiff bears the burden of proving causation and damages above $100,000. Defendant in this case mischaracterizes Graham as expanding the LPCF's right to raise defenses other than the issue of damages in a medical malpractice action. However, we find nothing in Graham to support Defendant's interpretation of the case. Graham simply expounds upon the effect of the LPCF's payment of $100,000 and clarifies the plaintiffs burden at trial after a settlement has occurred. Graham does not increase the LPCF's right to raise additional defenses other than that of damages. Therefore, the LPCF does not have the standing to raise the issue of prescription/peremption.
In Defendant's assignment of error number two, it alleges that Plaintiffs failed to show that Mrs. Miller suffered damages in excess of $100,000. In support of this argument, Defendant argues that the testimony and evidence at trial did not support the jury's verdict. It further argues that the trial court erred in refusing to admit certain evidence relating to issues of comparative fault. In assignment of error number three, Defendant alleges that the trial court erred in refusing to admit evidence that Mrs. Miller merely received a loss of chance of receiving untainted blood.
The court in Graham explains:
[T]he legislative intent of $100,000 in settlement establishes proof of liability for (1) the malpractice and for (2) damages of at least $100,000 resulting from the malpractice, which is a very significant benefit to the medical malpractice victim. However, at the trial against the Fund, the plaintiff has the burden of proving that the admitted malpractice caused damages in excess of $100,000.
In medical malpractice actions, as in general tort liability, a tortfeasor is liable for related medical treatment injuries suffered by a tort victim. Weber v. Charity Hosp. of Louisiana, 475 So.2d 1047 (La.1985). In this case, SBH admitted liability for the act of malpracticethe transfusion of the tainted blood that caused the Hepatitis-C. Consequently, in assessing the damages for which the LPCF is liable, we must consider not only the damage caused by the Hepatitis-C virus, but also that which resulted from the Interferon treatment.
Testimony was revealed during trial that Mrs. Miller may have had a preexisting auto-immune disease that was made symptomatic by the Interferon treatment. We find this revelation to be insignificant in the scheme of calculating the damage caused by Defendant. There is a bedrock principle in Louisiana regarding tortious conduct which states that "a defendant takes his victim as he finds him and is responsible for all the natural and probable consequences of his tortious conduct." [Emphasis added.] Parmelee v. Martin Marietta Michoud Aerospace, *20 Inc., 566 So.2d 441 (La.App. 4 Cir.1990); Perniciaro v. Brinch, 384 So.2d 392 (La. 1980). Therefore, even if Mrs. Miller did have a familial pre-disposition toward auto-immune disease, this in no way relieves Defendant's liability. Defendant would nonetheless still be liable for the act of malpractice and the consequential exacerbation of the underlying auto-immune disease. See Parmelee, 566 So.2d at 446.
Now that we have addressed causation, we must address the issue of damages. As already stated the jury awarded Mrs. Miller $400,000 for past and future mental anguish. Upon granting the JNOV, the trial judge upheld the award for mental suffering and awarded $250,000 for physical pain and suffering. In assessing the damage awards rendered by both the jury and the judge, we are guided by the axiom that we may not disturb an award made by the trial court unless the record reflects that the trier of fact abused its discretion. See Day v. South Line Equipment Co., 551 So.2d 774 (La.App. 1 Cir.1989). In determining whether the trial court erred in granting a JNOV as to quantum, the Supreme Court in Anderson v. New Orleans Public Service, Inc., 583 So.2d 829, 834 (La.1991) stated:
The appellate court, in determining whether the trial court erred in granting the JNOV as to quantum, once again uses the criteria set forth in Scott, supra, i.e., could reasonable men in the exercise of impartial judgment differ as to the fact that the jury award was either abusively high or abusively low. If the answer is in the affirmative, then the trial court erred in granting the JNOV, and the jury's damage award should be reinstated. On the other hand, if the answer is in the negative, then the trial court properly granted the JNOV, and its damage award based on its independent assessment of the damages is the judgment of the trial court which is reviewed on appeal under the constraints of Coco, supra.

Based upon the trial record, we do not find that the jury or the judge in the trial court proceedings abused their discretion. From the testimony detailed, we find that Plaintiffs successfully established that Mrs. Miller's damages were in excess of $100,000. We find it unnecessary to rehash the specifics of the multitude of ailments Mrs. Miller suffered as a consequence of the Hepatitis C virus and dermatomyositis. However, in summary, the record clearly shows that in addition to the host of side effects caused by the Interferon treatment, Mrs. Miller endured numerous lengthy hospital stays, including a stay in a hospice because she was perceived near death. Additionally, as a result of this illness, she lost the ability to tend to her most basic needs, forcing her to rely upon the assistance of her husband and adult children. In all, Mrs. Miller withstood irreparable damage to her liver, pain and multiple infections associated with the dermatomyositis, a gross change in her physical appearance and the loss of self-sufficiency. It is wholly apparent from the trial record that Mrs. Miller underwent a tremendous amount of physical pain and suffering throughout the period following the Interferon treatment and thus, the trial court's award was not a clear abuse of discretion. Further still, it is not difficult to conceive of the mental anguish Mrs. Miller endured in dealing with the rapid deterioration of her health and the possibility that she may ultimately die from either the Hepatitis-C or the dermatomyositis, or both. Consequently, we do not find that the jury or the trial court judge abused its discretion in rendering the awards for mental anguish and physical pain and suffering.
*21 We have already stated that the court in Graham held that the payment of $100,000 serves two purposes: (1) an admission of liability for the malpractice and (2) an admission of damages of at least $100,000. Consequently, since causation has been admitted, the only issue at trial is damages. Id. In Gravley v. Giambelluca, M.D., 98-0713, p. 2 (La.App. 4 Cir. 5/5/98), 758 So.2d 160, 161, we maintained the basic premise of Graham regarding the plaintiff's burden of showing damages in excess of $100,000; and we further stated that the LPCF is entitled to assert the comparative fault of the plaintiff and others so that the jury can apportion damages at trial. See Id.
Defendant contends that the trial court deprived it of the right to assert a comparative fault defense by refusing to admit certain pieces of evidence. In particular, Defendant alleges that the trial court committed manifest error by refusing to allow the LPCF to present evidence that 1) Mrs. Miller did not receive blood from SBH, 2) there were alternative risk factors for Hepatitis-C, 3) there was a lack of an accurate test for the virus in 1979 or the state of the art defense, 4) Mrs. Miller filed an identical lawsuit against Charity Hospital and 5) Mrs. Miller merely lost a chance of receiving tainted blood.
In determining whether a trial court has committed manifest error by the refusal or admission of certain testimony, we are bound by the edict that, "[T]he trial court is accorded vast discretion concerning the admission of evidence, and its decision will not be reversed on appeal absent an abuse of that discretion." Libersat v. J & K Trucking, Inc., XXXX-XXXXX, (La.App. 3 Cir. 10/12/00), 772 So.2d 173, writ denied, XXXX-XXXX (La.4/12/01), 789 So.2d 598. However, where the trial court has committed error in the admission or refusal to admit evidence, or in instructing a jury, when the appellate court has all of the facts before it such error will not warrant remand and the appellate court may make its own independent conclusion as to the facts as revealed in the record before it. See Parmelee, 566 So.2d at 444.
We find that the trial court did not commit manifest error in its refusal to admit evidence and/or testimony regarding the aforementioned issues. Although we acknowledge that the Defendant is permitted to present evidence of comparative fault, we find that this presents a certain quagmire in this case. Here, Defendant admitted liability for failing to test the blood used in the blood transfusion which ultimately caused Mrs. Miller to contract the Hepatitis-C virus; yet, all of the evidence that the Defendant sought to submit in reference to comparative fault is directly inapposite to the admission of liability. Graham clearly states that the sole issue at trial after the $100,000 payment is damages, not liability. However, here, Defendant sought to assert comparative fault defenses which in essence, nullified its own admission of liability. We find that although the LPCF may raise comparative fault defenses to distribute liability among other potential tortfeasors, it may not raise comparative fault defenses to the extent that it squarely contradicts its own admission of liability. Here, the LPCF admitted to the very act which caused the Hepatitis-C. Thus, the trial court did not abuse its discretion by refusing to admit evidence which would have rendered this admission meaningless.
Defendant's final assignment of error alleges that the trial court erred by granting the JNOV. A trial court's authority to grant a JNOV under Article 1811 of the Code of Civil Procedure "is limited by the jurisprudence to those cases where the jury's verdict is absolutely unsupported by any competent evidence." Boudreaux v. Schwegmann Giant Supermarkets, *22 585 So.2d 583, 586 (La.App. 4 Cir.1991); Selico v. Intercontinental Bulktank Corp., 98-0763, p. 6 (La.App. 4 Cir. 5/12/99), 733 So.2d 1240. Anderson v. New Orleans Public Service, Inc., 583 So.2d 829 (La.1991) sets forth the standard of review regarding the granting of a JNOV:
A JNOV is warranted when the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict. The motion should be granted only when the evidence points so strongly in favor of the moving party that reasonable men could not reach different conclusions, not merely when there is a preponderance of evidence for the mover. If there is evidence opposed to the motion which is of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion should be denied. In making this determination, the court should not evaluate the credibility of the witnesses, and all reasonable inferences or factual questions should be resolved in favor of the non-moving party.
Id. at 832.
This given, once a JNOV is granted, the trial court has the discretion to determine the proper amount of damages and makes the award as though it were the fact finder. See Anderson, supra. We find that based upon the testimony and evidence presented at trial, that the trial court judge did not abuse her discretion in granting the JNOV. In reviewing the trial court's award of damages, we are guided by the precept that a court of appeal may not set aside a trial court's or a jury's finding of fact in the absence of "manifest error" or unless it is "clearly wrong." Rosell v. ESCO, 549 So.2d 840 (La.1989).
We have already set out the physical setbacks Mrs. Miller suffered as the result of the malpractice. The jury awarded damages for mental pain and emotional anguish in the amount of $400,000. However, the jury failed to assess damages for past, present and future physical pain and suffering. Our case law provides that although a jury has much discretion in assessing damages, it errs as a matter of law by refusing to award general damages for objective injuries. Durham v. Stevens Transport, Inc., 98-1261, (La.App. 5 Cir. 3/30/99), 731 So.2d 451; Haydel v. Commercial Union Ins. Co., 617 So.2d 137 (La.App. 5 Cir. 3/30/93). Boulmay v. Dubois, 593 So.2d 769 (La.App. 4 Cir.1992). From the lengthy testimony of the physicians and Plaintiffs at trial, the trial court judge did not abuse her discretion. The record clearly showed that Mrs. Miller suffered objective injuries. Not only did the physicians recount Mrs. Miller's physical pain and suffering but Mrs. Miller also testified to the many obstacles she has suffered as a result of this disease. Due to the illness, she was unable to care for herself and therefore, had to rely on her children for her most basic needs, such as using the bathroom. Furthermore, she testified that the rashes were so painful, that at times she could not even wear clothing because it irritated her skin. In addition, her health had deteriorated so drastically that she was admitted to a hospice because her physician thought she had no chance of survival.
The jury also failed to award damages for past, present and future lost wages. However, the testimony presented by both the economists for Plaintiffs and Defendant stated that Mrs. Miller had suffered lost wages. Dr. Randolph Rice, an economist who testified on behalf of Plaintiffs, stated that Mrs. Miller had suffered lost wages of $99,614 and a loss of earning *23 capacity in the amount of $107,468. Dan Cliffe, a public accountant who testified on behalf of Defendant stated that Mrs. Miller was entitled to lost wages in the amount of $38,250 and a loss of earning capacity in the amount of $99,655. Upon granting the JNOV, in accordance with Dr. Rice's testimony, the trial judge awarded Mrs. Miller $101,150 for loss of earning capacity and $99,614 in damages for loss of wages. We again find no error here, as the record supports this award.
The jury also failed to award Mrs. Miller compensation for medical expenses. Upon the JNOV, the trial judge granted Mrs. Miller $393,636.09 for past medical expenses and ordered the LPCF to pay for future medical care and related expenses. We find that the physician's testimony, medical bills and prescription receipts justify the rendering of this award.
Plaintiffs raises eight issues on appeal. Issues one, two and three relate to whether causation and damages were sufficiently proven at trial, thus warranting the JNOV. We have already addressed these issues when discussing Defendant's assignments. Therefore, we will only address assignments of error four through seven.
Prior to trial in an Answer to Request for Admissions, SBH admitted that Mrs. Miller would need future medical care and related benefits arising from and as a consequence of her contraction of the Hepatitis-C. This was never admitted into evidence; however, in Plaintiffs' fourth assignment of error, they argue that this should have been admitted at trial. We pretermit discussion of this issue because we affirm the judgment of the trial court award, which ordered Defendant to pay for all future medical costs related to the Hepatitis-C virus. In Plaintiffs' sixth assignment of error, they argue that the trial court erred in allowing the physician, Dr. Balart, to testify that $390,000 is "a lot of money." Subsequently, Plaintiffs' argue that his testimony improperly influenced the jury to award $400,000. Since we have affirmed the decision of both the jury and the trial court judge in granting the JNOV and increasing the award, we find that this issue moot.
In Plaintiffs' assignment of error number five, they allege that Mrs. Miller is entitled to two separate capsone for the Hepatitis-C and another for the dermatomyositis. Under La. R.S. 40:1299.41, the maximum amount that Plaintiff can recover for a medical malpractice action is $500,000. In response, Defendant argues that Plaintiffs should not be able to raise this issue now because they did not raise the issue of receiving the benefit of two caps in their Answer to Appeal. Defendant is correct in that Plaintiffs may not raise this argument because they failed to set forth this issue in their Answer to Appeal. See La. Civ.Code art. 2133; Minvielle v. Minvielle, XXXX-XXXX, p. 4 (La.App. 5 Cir. 11/15/00), 776 So.2d 1223, 1226, writ denied, XXXX-XXXX (La.2/9/01), 785 So.2d 823; Girgis v. Macaluso Realty Comp., Inc., XXXX-XXXX, p. 6 (La.App. 4 Cir. 1/31/01), 778 So.2d 1210, writ denied, XXXX-XXXX (La.6/1/01), 793 So.2d 199. Therefore, we will not consider this issue.
Plaintiffs allege that Williams v. Kushner, 549 So.2d 294 (La.1989) compels us to find that the monetary statutory limitation of $500,000 set forth in La. R.S. 40:1299.41 is unconstitutional because there is no statutory monetary limitation in claims against state health care providers sued for medical malpractice. In Williams, the Louisiana Supreme Court held that the Medical Malpractice Act was unconstitutional because Act 435 of 1984 permitted recovery for future medical malpractice costs for private sector claims filed on or after September 1, 1984; yet, Act 239 of 1985 provided for recovery of *24 future medical costs filed for medical malpractice claims against the state that were in litigation at the time or pending. The Supreme Court found that the act unfairly penalized litigants who had claims against private hospitals. The court found this to be a "clear violation of the Louisiana Constitutional guarantee of equal protection." Id at 297. As such, Plaintiffs urge this court to declare that the $500,000 statutory cap imposed upon litigants who have claims against private hospitals is similarly a constitutional violation.
Our Louisiana Supreme Court has previously addressed the issue of the $500,000 recovery cap and as such, we are bound by its edict. In addressing the constitutionality of this statute, the Supreme Court in Butler v. Flint Goodrich Hosp. of Dillard Univ., 607 So.2d 517 (La. 1992), cert. denied, Butler v. Medley, 508 U.S. 909, 113 S.Ct. 2338, 124 L.Ed.2d 249 (1993) stated:
Overall, the Louisiana Medical Malpractice Act represents a reasonable but imperfect balance between the rights of victims and those of health care providers. It does not violate the state or federal constitutions.
See also Moody v. United National Insurance Company, 95-1 (La.App. 5 Cir. 5/10/95), 657 So.2d 236; Turner v. Massiah, 94-29 (La.App. 5 Cir.7/1/94), 641 So.2d 610.
Therefore, since we are constrained to follow the rulings of our Supreme Court, there is no merit in this assignment of error.

CONCLUSION
For the reasons stated herein, we affirm the judgment of the trial court.
AFFIRMED.