810 So.2d 1283 (2002)
Carolyn McGRATH, As Legal Tutrix of Their Minor Child, Lindsey Nicole Palmour,
v.
EXCEL HOME CARE, INC.
Nos. 01-CA-1270, 01-CA-1271.
Court of Appeal of Louisiana, Fifth Circuit.
March 26, 2002.
Rehearing Denied April 15, 2002.
*1285 Jacqueline G. Griffith, Glen Patrick McGrath, Griffith Battard and Johnson, New Orleans, Louisiana, for Appellants Louisiana Patients' Compensation Fund and Oversight Board, and Excel Home Care, Inc.
S. Daniel Meeks, Patrice W. Oppenheim, Metairie, Louisiana, for Appellee National Union Fire Insurance Company of Pittsburgh, PA.
Michael D. Riley, New Orleans, Louisiana, for Appellee Carolyn Mcgrath, As Legal Tutrix for the Minor Child, Lindsey Nicole Palmour.
Panel composed of Judges EDWARD A. DUFRESNE, JR., JAMES L. CANNELLA and SUSAN M. CHEHARDY.
JAMES L. CANNELLA, Judge.
In this medical malpractice action filed against Excel Home Care, Inc. (Excel) and its insurer, St. Paul Fire & Marine Insurance Company (St.Paul), the Louisiana Patients' Compensation Fund and Oversight Board (the PCF), appeals from a jury verdict and judgment in favor of Plaintiffs, Carolyn McGrath (McGrath), as legal tutrix of the minor child, Lindsey Palmour, and National Union Fire Insurance Company of Pittsburgh, PA (National).[1] McGrath and National answered the appeal relative to the amount of damages. We affirm.
On March 27, 1996, Lindsey Palmour's father, Matthew Palmour (Palmour), suffered severe crushing injuries in a workplace accident while operating a crane for his employer, Pool Company (Pool). National insured Pool for workers' compensation claims. As a result of the accident, Palmour, who was 29 years old, was rushed to West Jefferson General Hospital, where physicians had to amputate his entire body below the navel in order to save his life.[2] His treating physician was Dr. Clifford Ameduri, who led a team of physicians and therapists, including a plastic and reconstructive surgeon, Dr. Jonathan Boraski, who performed the skin grafts.
During 13 months in the hospital, the doctors reconstructed Palmour's bowel and bladder functions, redirecting them into bags and performed skin grafts on the site of the amputation. He was discharged on April 25, 1997, with the concurrence of all of his physicians. Although he had suffered infections during his hospitalization, his physicians found him to be free from infection at that time. His skin graft was expanding over the distal wound, and was thus healing. Dr. Boraski did not foresee any further surgery. However, because his distal wounds were still open and because of the potential for infections due to the open wound and the urine and bowel disposal system, strict cleanliness procedures were critical to prevent cross-contamination. Nevertheless, the physicians determined that he was able to go home, a decision about which Palmour was understandably excited. He looked forward to being home with his five-year-old daughter, Lindsey.
Because Palmour required nursing around the clock, National hired Excel to manage Palmour's home care. Excel provided two certified nursing assistants (NA) to stay with Palmour 14 hours per day, and one NA to be with him ten hours each night. A skilled nurse examined Palmour every day.
On May 2, 1997, Palmour contracted a urinary infection that was successfully treated and resolved. A second one occurred on May 27, 1997. Dr. Ameduri felt *1286 that this time he had no choice but to readmit Palmour to the hospital to treat his infection and also because his surgical site had become necrotic and the skin grafts had to be redone. Palmour was depressed and anxious about his condition and hospitalization. The evidence was uncontradicted that both infections and the resulting problems with the surgical site were the direct result of the negligence of the Excel personnel.
During Excel's care of Palmour in which the nursing staff allowed Palmour's trunk and surgical site to rest on urine soaked towels, the surgical site became contaminated, resulting in the break down of the skin grafts. The negligence of the staff further compromised the "closed system" of urine disposal and caused the urinary infection by frequently placing his urostomy (urine) bags on the dirty floor and allowing a leak at the urostomy site to go untreated and unreported to the doctors. According to the testimony of Dr. Ameduri and Joy Budwine, a registered nurse (RN) who served on the medical review panel, a closed system of urine containment is critical because urine is sterile in the body, but breaks down into urea/ammonia once exposed to air. Since ammonia burns, it caused the tissue to break down. Furthermore, the nurse assistants were aware that Palmour was suffering from phantom pain, a sign of infection, which would have been evident because phantom pain causes jerking or spasms. They also knew that his urostomy site was leaking into the open wound at his sacrum. Furthermore, Palmour complained of headaches and had profuse sweating, both of which are indications of infection. Yet, no one bothered to contact Palmour's treating physician, Dr. Ameduri, about the urostomy leak or the phantom pain and the visiting nurse, whose reports show she knew of the unsanitary conditions, failed to report them to the doctor.
For the next five months, from May of 1997 until October of 1997, Palmour remained in the hospital where he underwent further skin grafts and his urinary infection was treated successfully. His infection was resolved on June 11, 1997, but it took several months to bring his skin grafts back to where they were when he went home in April of 1997. On October 17, 1997, Palmour was again discharged from the hospital. His home care was assumed by another company.
One year later, in November of 1998, Palmour returned to the hospital. He died while there on May 22, 1999.
On May 7, 1998, National filed a lawsuit to recover medical expenses which it had paid due to Excel's malpractice. On June 10, 1998, National filed a Complaint with the PCF requesting a medical review panel. On August 13, 1998, National dismissed its district court petition without prejudice because of prematurity.
Following the medical review panel's consideration of the allegations, the members issued a unanimous ruling in favor of Palmour and National and against Excel. On September 2, 1999, McGrath filed a Petition of Intervention with the PCF seeking to intervene in National's complaint against Excel. On October 14, 1999, she filed a district court petition for damages on behalf of Lindsey Palmour. On November 15, 1999, National filed a petition for its damages. McGrath's petition of intervention in the medical review panel proceedings was rejected on November 16, 1999 because it duplicated National's complaint. The two lawsuits against the Defendants were consolidated on May 12, 2000.
A jury trial was held on March 12, 13, and 14, 2001, after which the jury found that Excel's negligence caused injuries to Palmour, his daughter, and National. The jury awarded $90,000 to Palmour for his *1287 pain and suffering, $150,000 to Lindsey Palmour for her past and future loss of love, affection, and society, and $60,000 to National for medical expenses it had paid on Palmour's behalf. The verdict of the jury was made a judgment after the trial court on March 19, 2001.
Following the trial, the Defendants, Excel, and St. Paul, paid to Lindsey Palmour, $88,791.68. On April 26, 2001, a Satisfaction of Judgment was executed reciting that this payment is the limitation of liability owed to her by law by the Defendants, with a reservation of her right to claim the remainder of the judgment damages from the PCF.
On appeal, the PCF asserts that the medical malpractice action was prescribed, that there is no right of action for the death claim, that the action was premature that causation was not established, and the trial judge failed to determine the degree and percentage of fault as to all parties and non-parties.
In brief, National claims that it was paid more than $20,000 in settlement of its claims and that the PCF acknowledged that this. Also, together with the payment made to Lindsey Palmour, this satisfied the $100,000 limitation of liability owed by the Defendants. However, the document in support of that assertion is not in the record, but is attached to the brief. We cannot consider any evidence not filed properly into the record. Nonetheless, a review of the Plaintiffs' Satisfaction of Judgment states that the payment to her "constitutes Excel Home Care, Inc's limits of liability by law. The balance of the judgment is due from the Louisiana Patients' Compensation Fund." We find that this sufficiently proves that the legal limitation of liability owed by the Defendants of $100,000 was paid to the Plaintiffs.
La.R.S. 40:1299.44(C)(5) provides in part:
In approving a settlement or determining the amount, if any, to be paid from the patient's compensation fund, the court shall consider the liability of the health care provider as admitted and established where the insurer has paid its policy limits of one hundred thousand dollars, or where the self-insured health care provider has paid one hundred thousand dollars. [Emphasis added.]
The Medical Malpractice Act constitutes a special legislative provision in derogation of the general rights available to tort victims and must be strictly construed. Galloway v. Baton Rouge General Hosp., 602 So.2d 1003, 1005 (La.1992); McCrory v. Jefferson Parish Hosp. Service Dist. No. 2, 96-624 (La.App. 5th Cir.12/30/96), 686 So.2d 1060, 1063. Once the qualified health care provider (or its insurer) pays $100,000 to a medical malpractice victim, the admission of liability provision of R.S. 40:1299.44(C)(5) is triggered and the only contested issue remaining between the victim and the Patient's Compensation Fund is the amount of the victim's damages in excess of the amount already paid. Graham v. Willis-Knighton Medical Center, 97-0188 (La.9/9/97), 699 So.2d 365, 372; Stuka v. Fleming, 561 So.2d 1371 (La.1990), cert. den., 498 U.S. 982, 111 S.Ct. 513, 112 L.Ed.2d 525; McCrory, 686 So.2d at 1063.
In Stuka, the Louisiana Supreme Court stated that, "A suit under the Medical Malpractice Act is against the health care provider only and not against the Fund, because the health care provider is the only party defendant contemplated by the Act." Stuka, 561 So.2d at 1374. See also: McCrory, 686 So.2d at 1063. The status of the PCF after a settlement of $100,000 is "more in the nature of a statutory intervenor than a party defendant," so that the Fund "may put on evidence and *1288 unite with the defendant in resisting the victim's demands, and may appeal a judgment, but may not object to the form of the action." Stuka, 561 So.2d at 1374. See also: McCrory, 686 So.2d at 1063. In Thomas v. Insurance Corp., 93-1856 (La.2/28/94), 633 So.2d 136, 139, the Louisiana Supreme Court stated that the Fund in not a negligent party or a C.C. art. 2315 Defendant. Rather, it is "simply a third party with an interest in the proceedings when the damages exceed $100,000." See also: McCrory, 686 So.2d at 1063-64. See also: McCrory, 686 So.2d at 1064. Thus, after the $100,000 has been paid, the PFC cannot raise comparative fault or causation, which is an element of liability. Id.
Since Excel's insurer paid the $100,000 limits of liability for the malpractice of Excel, the PFC here challenge the excess amount of damages awarded by the jury.

EXCEPTIONS:
A medical malpractice action must be filed within one year from the date of the alleged act, omission, or neglect, or within one year of the date of discovery, but in all instances such claims shall at the latest be filed within a period of three years from the date of the alleged act, omission or neglect. La. R.S. 9:5628; Tuazon v. Eisenhardt, 98-666 (La.App. 5th Cir.12/16/98), 725 So.2d 553, 555.
The Louisiana Supreme Court has not yet addressed the issue of whether the settlement precludes the PFC from raising exceptions. However, the Fourth Circuit has held that, once the insurer has paid its policy limits, statutory liability is admitted and the Fund has no standing to raise the issue of prescription. Miller v. Southern Baptist Hosp., 00-1352 (La.App. 4th Cir.11/21/01), 806 So.2d 10; Rey v. St. Paul Fire and Marine Ins. Co., 95-0661 (La.App. 4th Cir.11/16/95), 665 So.2d 109, 111, writ denied, 95-3033 (La.3/22/96), 669 So.2d 1223. "Rather, it is for the Legislature to determine whether additional rights should be given the Fund in order to provide it with greater protection against questionable claims." Rey, 665 So.2d at 111. Conversely, if the settlement is for less than the $100,000 limit of liability, the PFC has standing to raise the exception of prescription. See: St. Romain v. Luker, 00-1366, (La.App. 1st Cir. 11/9/01), 804 So.2d 85.[3]
We agree with the Fourth Circuit decisions in Rey and Miller, and find that the PFC does not have the right to raise the exception of prescription, and further is not entitled to raise any exceptions after the limitation of liability has been satisfied. The statutes and jurisprudence are clear that such payment is an admission of liability. The PCF does not stand in the shoes of the Defendant. It is a creature of the legislature created solely to pay the excess damages to an injured plaintiff who can prove that his excess damages were caused by the health care provider's malpractice. To allow it to raise exceptions after the payment would be to permit it to raise defenses only given to a Defendant, which it is not. See: McCrory, 686 So.2d at 1064. Thus, we find that the PCF cannot raise the exceptions at this time.
Furthermore, we note that the PFC has failed to present its exceptions in a formal pleading, but raised them in its brief. Thus, they are not properly before this Court. In Hyde v. Hibernia National Bank in Jefferson Parish, 584 So.2d 1181, 1184 (La.App. 5th Cir.1991), we held that "Regardless of where it is filed, it must be presented in a formal pleading and cannot be merely argued in brief." See also: Anderson v. May, 01-1031 at p. 1 (La.App. *1289 5th Cir.2/13/02), 812 So.2d 81, 83. In Hyde and Anderson we refused to consider the exception presented solely in the brief. However, we address the issue nonetheless to preclude the PCF from filing the formal exception subsequent to this decision and in the interest of judicial economy.

EXCESS DAMAGES
The appellate court may not set aside the factual findings made by the trier of fact in the absence of manifest error. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099, 93-3110, 93-3112 (La.7/5/94), 639 So.2d 216. The manifest error rule applies in appeals of medical malpractice actions. Rebstock v. Hospital Service Dist. No. 1, 01-659 (La.App. 5th Cir.11/27/01), 800 So.2d 435, 437. Causation in medical malpractice cases is subject to the manifest error standard of review. Rebstock, 800 So.2d at 437.
In regard to the excess damages, the jury was presented with substantial evidence of Excel's negligence which caused Palmour's extraordinary problems. However, the jury interrogatories only asked if the negligence of Excel caused damages to Palmour, Lindsey Palmour and National. All were answered affirmatively and the awards were handwritten in the blanks reserved for each of the Plaintiffs. There is no way for this Court to determine if the jury awarded the damages from April 25, 1997 through and including his death in 1999, or if the awards were for the negligent care of Palmour during the month he was under their care and the resulting second five months of hospitalization. In any case, the evidence was overwhelming that the second hospitalization was necessitated by the conduct of Excel's personnel. All of the doctors who treated Palmour concurred that he was able to go home after the first 13 months in the hospital. All of the doctors agreed that any infections that he had were resolved. He did not have any active infection and his torso surgical wounds were healing. Thus, we find no manifest error in the jury's award of damages in excess of $100,000.

PLAINTIFFS' APPEAL OF DAMAGE AWARDS
Both Plaintiffs appealed the award of damages, asserting that the awards were inadequate when you consider how Palmour's condition deteriorated from the time that Excel cared for him until his death. The standard of review for damage awards requires a showing that the trier of fact abused the great discretion accorded in awarding damages. Stevenson v. Louisiana Patient's Compensation Fund, 97-709 (La.App. 5th Cir.4/9/98), 710 So.2d 1178, 1181. The discretion vested in the trier of fact is great, "even vast," so that an appellate court should rarely disturb an award of general damages. Id. In this case, while we find the award for Palmour's pain and suffering to be low, we cannot say that it or the other awards are so low as to constitute an abuse of the jury's vast discretion.
Accordingly, the judgment of the trial court is hereby affirmed. Costs of appeal are assessed against Defendants.
AFFIRMED.
NOTES
[1] McGrath is the child's paternal grandmother.
[2] The procedure is a hemicorpectomy (i.e., trans-lumbar amputation.)
[3] In Higgins v. Pitard, 99-1053 (La.6/18/99), 734 So.2d 1213, the Louisiana Supreme Court declined to address the issue of whether the PFC is entitled to raise the peremptory exception of prescription.